# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Evangelina Forsberg, :
:
    Plaintiff, :
:
v. : CIVIL ACTION NO.
: 1:07-cv-03116-JOF-RGV
James Pefanis, et al., :
:
    Defendants. :
:

## OPINION & ORDER

This matter is before the court on Plaintiff's motion for sanctions [149].

**I.    Background**

    **A.    Procedural History**

On September 2, 2009, Plaintiff filed the instant motion concerning the circumstances of the creation of a statement of David Popke submitted by Defendants in conjunction with their defense of Plaintiff's claims. One of the allegations made by Plaintiff in this case is that on August 16, 2007, in Mildred Hinton's office, Defendant Pefanis grabbed her from behind between her legs, held her vagina and told Mr. Popke and Ms. Hinton that her vagina was "tiny." In defense against Plaintiff's allegations, Defendants have proffered that both Mr. Popke and Ms. Hinton will testify that they did not see any incident as described by Plaintiff. Defendants also submitted the undated statement of David Popke stating:

> To Whom It May Concern:
>
> I do not recall the incident Ms. Forsberg is referring to in the letter dated October 1, 2007.
>
> /David Popke/
> David Popke

*See* Plaintiff's Motion for Sanctions, Exhibit A. For purposes of clarity, the court refers to this document as the "Popke Statement."

In preparation for the trial in this matter, scheduled for October 13, 2009, Plaintiff learned that Mr. Popke currently resides in Texas and her counsel hired a private investigator to locate Mr. Popke. Upon locating Mr. Popke, he made two declarations for Plaintiff, one in which he affirmed that he had seen Defendant Pefanis grab Plaintiff from behind between her legs, *see* Plaintiff's Motion, Exh. B, and one in which he denied having signed the Popke Statement. *See* Plaintiff's Motion, Exh. C. The court refers to these documents as the "Popke Declarations." In fact, Mr. Popke declared, Defendant Pefanis and Wayne Bonertz, co-owner of AME, had both approached him and told him he needed to sign the typewritten statement at Exhibit A. They both implied that his continued employment was contingent upon signing. Mr. Popke testified, however, that he refused to sign the statement and does not know who signed Exhibit A, other than it is not his signature. Mr. Popke left AME in December 2007. *See* Exh. C.

AO 72A
(Rev.8/82)

Plaintiff then obtained the opinion of a forensic document examiner who also stated that it was not Mr. Popke's signature on the Popke Statement. Upon obtaining this evidence, Plaintiff filed the instant motion for default sanction against Defendants on the basis of their utilization of a forged document to perpetrate a fraud on the court. On September 18 and September 21, 2009, the court held an evidentiary hearing on the motion. The court directed the parties to file post-hearing briefs which have been submitted.

**B.    Evidence Obtained Through Hearing**

Plaintiff presented the testimony of Farrell C. Shiver, a forensic document examiner. Mr. Shiver testified among other things, as to his qualifications, including his undergraduate education, his training and work in the military, as well as in civilian life; his testimony in numerous state and federal court cases; and his Board Certification by the American Board of Forensic Document Examiners. He then discussed the method he used to examine the signature on the Popke Statement in comparison to known signatures of Mr. Popke, including the declarations signed by Mr. Popke in Texas, Mr. Popke's voter's registration card, and numerous real estate documents located by Mr. Shiver on line and signed by Mr. Popke in the course of his employment with AME. Mr. Shiver testified that he followed the American Society for Testing and Materials (ASTM) standards promulgated for questioned document examination, including E1658 which sets forth the manner in which the conclusions of a forensic document examiner are to be expressed.

AO 72A
(Rev.8/82)

Mr. Shiver then offered his opinion that Mr. Popke had not signed the Popke Statement, pointing out the numerous significant differences between the two signatures, including the formation and looping of the capital letter "D," the connection between the "a" and the "v," the lower case "d," and the capital "P," as well as the ending strokes in "ke" in the name "Popke." Plaintiff rested on the testimony of Mr. Shiver and the submission of the two Popke Declarations.

Defendants presented the testimony of Teresa DeBerry as an expert in forensic document examination. Ms. DeBerry has no undergraduate degree and studied for two years with Handwriting Services International (HSI), a "distance learning" program. She has worked as a forensic document examiner for five years and has worked with mentors during this time period as a means of training. Ms. DeBerry has testified in court three times and given one deposition. She testified that she compared the handwriting samples side by side, individual letter by individual letter. She also used Photoshop to skew the slant of the handwriting.

Ms. DeBerry testified that her side-by-side comparison showed a forgery of such poor quality that Ms. DeBerry considered the possibility that the signature on the Popke Statement was "disguised" writing, that is the signer was David Popke, but he tried to disguise his signature so that it would not appear to be his own. When determining whether a signature is "disguised," the document examiner considers the potential motive and the

4

circumstances surrounding the signature. Ms. DeBerry could not recall whether anyone suggested the possibility of disguise to her or whether she developed that theory on her own. Ms. DeBerry concluded that the signature was "disguised" because of numerous consistent "habits" she noted between the signatures on the known documents and the signature on the questioned document. She noted, for example, her opinion that the "stem" height of the capital "P" was consistent across all documents, as well as the space between the first and last names, the failure to complete the "loop" in the capital "P," and the pattern of the connecting stroke between the "v" and the "i". Ms. DeBerry also found that the loop in the "o" and the "p" were elongated and oval.

On cross-examination, however, Ms. DeBerry was forced to admit that the signer did not follow these "habits" all, or even most, of the time. For example, the signer would close the loop on the capital "P" about half of the time and not complete it the other half. While this could be considered a "natural variation" in writing, it certainly cannot support the idea that the writer has consistent "habits" he cannot disguise even when making a conscious effort to do so. When pressed on how she reached the conclusion that the signature was disguised, Ms. DeBerry admitted that her initial evaluation led her to think that the signature could not be a forgery because it was so terrible. She was aware of the fact that (according to Defendants' witnesses) Mr. Popke did not want to sign the document, so she considered the possibility of disguise. When reminded by Plaintiff's counsel that Mr. Shiver had

5

testified that there were three categories of forgery, including "simple" forgery where the forger does not attempt to mimic the actual signature, Ms. DeBerry stated she did not know whether it was a simple forgery. She finally testified that if it was not a "disguised" signature, it would be a forgery.

Understanding that Ms. DeBerry's testimony was not strong, over the weekend between hearing dates, Defendants' counsel solicited the testimony of another proposed expert, Steven Drexler. Because Mr. Drexler's opinion was not disclosed to Plaintiff's counsel until the morning of the hearing, the court did not permit Mr. Drexler to testify, but did admit into evidence Mr. Drexler's curriculum vitae and his letter opinion. In his letter opinion, Mr. Drexler stated that the "David" and "Po" portions of the signature appear "bold, heavy, and lack the expected normal variations in pen pressure. In addition, these portions of the signature appear slowly and deliberately written lacking expected nature rhythm and speed." *See* Defendants' Exh. 8, at ¶ A.1. He continued: "The 'pke' portion of the signature appears more rapidly executed. There are variations in pen pressure and some elements of speed and rhythm." *Id.*, ¶ A.2. Finally, he testifies:

> Laboratory examinations and comparisons of the Item Q1 David Popke signature to the known handwriting standards of David Popke revealed some similarities and significant differences in speed, rhythm, slant and letterforms. There appears to be little effort by the author to imitate the habits and characteristics of a genuine David Popke signature.

*Id.*, ¶ B. Mr. Drexler's opinion is:

6

AO 72A
(Rev.8/82)

> Based upon the noted lack of natural movements, speed and rhythm of the "David" and "pke" portions of the Item Q1 questioned signature it is the opinion of the undersigned that there are strong indications that these entries are not the natural handwriting of the author. There are some elements of speed and rhythm noted in the "pke" portion of the questioned signature. However, the "pke" entry is limited in comparable characteristics, thus limiting the comparisons to the natural normal course of business handwriting standards. Accordingly, the opinion of the undersigned as to whether-or-not David Popke signed the Item Q1 document is inconclusive.

*Id.* at 2.

Defendants also called Robert Anderson to testify. Mr. Anderson is the Vice President of the Wholesale Department at AME. He stated that he was aware that Ms. Forsberg's counsel sent a letter to AME on October 1, 2007, in which she recounted the August 16, 2007, incident as a basis of her allegations of employment discrimination. Mr. Anderson witnessed a conversation between David Popke and Jim Pefanis where Mr. Popke told Mr. Pefanis that he (Popke) did not want to get involved in the situation and would not sign anything. After further back-and-forth, Mr. Popke finally said he would sign a statement but he did not have time to type it up, so that Mr. Pefanis should type something and put it in front of Mr. Popke for his signature. Mr. Anderson did not see where Mr. Popke and Mr. Pefanis went after this conversation, but about two minutes later Mr. Pefanis and Mr. Bonertz came out of Mr. Bonertz's office and Mr. Anderson saw Mr. Popke sign the statement. Mr. Anderson testified that Mr. Popke quickly signed (but did not scribble) his signature. After the signing, Mr. Pefanis and Mr. Bonertz went in to Mr. Bonertz's

7

office where Mr. Pefanis said that Mr. Popke's signature looked different and Mr. Pefanis left to ask Mr. Popke to sign the document again.

Mr. Anderson was questioned extensively about a $67,000 Lexus that he purchased and AME paid for. Mr. Anderson testified that the car was purchased on May 3, 2008, for the purchase price of almost $81,000. The financing arrangements recognized that a Porsche owned by Mr. Pefanis was traded in at the time of the Lexus purchase. Plaintiff's counsel pointed out that Mr. Anderson received a notice of deposition in this case in March 2008, and five weeks after that Mr. Anderson received a new Lexus in his name, but was paid for through a car allowance from AME. Mr. Anderson had previously received car payment credits on his salary, but the amount for the Lexus exceeded that of the previous salary arrangement and Mr. Anderson did not count this amount as income for the purposes of taxes. Mr. Anderson testified that he had not asked Mr. Bonertz for a new company car.

Ms. Phyllis Lee also testified for Defendants. She shared an office with David Popke. She recalls Mr. Bonertz coming in to the office and asking Mr. Popke to sign a statement again because his signature did not look right. Mr. Popke refused to do so and Mr. Bonertz had no reaction to this refusal.

Finally, Defendants called Jim Pefanis to the stand. He recalled talking to David Popke about preparing a statement saying he had not seen any inappropriate contact between Jim Pefanis and Plaintiff on August 16, 2007. Mr. Popke refused saying he did not have the

8

time and was not making enough money to get involved. He finally told Mr. Pefanis to type something up. Mr. Pefanis went to Wayne Bonertz's office and typed the statement. He then took it to Mr. Popke's office. Mr. Popke complained again and just signed off on the statement and tossed the paper back to Mr. Pefanis. After Mr. Pefanis returned to Wayne Bonertz's office, he noticed that the signature did not look like Mr. Popke's. He asked Mr. Popke to sign it again and he refused. Mr. Pefanis left Mr. Popke's office and told Mr. Bonertz to deal with the situation.

Although Wayne Bonertz had previously proffered testimony on this matter, and although Defendants announced Mr. Bonertz would be testifying after a recess taken on the morning of the hearing of September 21, 2009, when court was called back into session, Mr. Bonertz, without explanation, was not called to the stand to testify.

### C. Contentions

Plaintiff argues that she has presented clear and convincing evidence that Defendants forged Mr. Popke's signature on the Popke Statement based on the expert testimony of Mr. Shiver and the Popke Declarations. Because Defendants perpetrated a fraud on the court, Plaintiff contends that the only appropriate sanction is a striking of Defendants' answer. Plaintiff avers that under Federal Rule of Civil Procedure 43(c), the court may consider the Popke Declarations even though Mr. Popke did not appear as a witness at the hearing.

9

Plaintiff contends that Defendants received the due process they were entitled to because they were given the opportunity to depose Mr. Popke, but declined to do so.

Defendants respond that it would be error for the court to impose the sanction of default in this situation because (1) Defendants would be deprived of due process if the court accepted the Popke Declarations without Defendants having an opportunity to cross-examine Mr. Popke and (2) Plaintiff failed to prove by clear and convincing evidence that the Popke Statement was forged, pointing to the testimony of Defendants' second expert who opined that he could not conclude who signed the Popke Statement. Defendants do not argue that there is some sanction lesser than striking the answer that would be appropriate were the court to conclude that the signature on the Popke Statement was forged.

## II. Discussion

### A. Preliminary Matters

> A court may impose sanctions for litigation misconduct under its inherent power. The Court's inherent power derives from the court's need to manage its own affairs so as to achieve the orderly and expeditious disposition of cases. This power, however, must be exercised with restraint and discretion. The key to unlocking a court's inherent power is a finding of bad faith. . . . A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order. . . . The dismissal of a party's complaint or answer, or striking its defenses, as a sanction . . . is a heavy punishment, appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders.

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009) (quotations and citations omitted). The court must be careful in utilizing its inherent powers

and must comply with the mandates of due process when doing so. *See Chambers v. NASCO*, 501 U.S. 32 (1991). "Due process requires that [a party] be given fair notice from either the court or the complaining party that his conduct may warrant sanction and an opportunity to respond." *See In re Ocon*, 2009 WL 405370 (11th Cir. Feb. 19, 2009); *see also Kipperman v. Onex Corp.*, ____ F.R.D. _____, 2009 WL 1473708 at *18 (N.D. Ga. 2009) (Forrester, J.) (noting that due process requires fair notice to party from either court or opposing party that conduct may warrant sanctions and why; party subject to sanctions must be given opportunity to justify its actions either orally or in writing) (citing *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006)).

The court noted at the outset of the hearing that Plaintiff had an evidentiary issue with respect to the Popke Declarations. Because Mr. Popke was not present and did not testify at the evidentiary hearing, the court raised concerns about hearsay issues and directed the parties to address the issue in their post-hearing briefs. The court noted, for example, that Federal Rule of Evidence 1101(b) provides:

> These rules [of evidence] apply generally to civil actions and proceedings, including admiralty and maritime cases, to criminal cases and proceedings, to contempt proceedings except those in which the court may act summarily, and to proceedings and cases under title 11, United States Code.

Fed. R. Evid. 1101(b). The rules do not apply to "[p]roceedings for extradition or rendition; preliminary examinations in criminal cases; sentencing, or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings

11

with respect to release on bail or otherwise." *Id.*, § 1101(d)(3). Of course, the list in Rule 1101 is not exclusive or complete. *See*, *e.g.*, *U.A.W. v. General Motors Corp.*, 235 F.R.D. 383, 386 (E.D. Mich. 2006); *United States v. Singer*, 345 F. Supp. 2d 230, 234 (D. Conn. 2004). Furthermore, in *Cook v. American S.S. Co.*, 134 F.3d 771 (6th Cir. 1998), the court affirmed a district court order sanctioning an attorney under 28 U.S.C. § 1927 where the district court did not provide a full hearing, but did comply with the requirements of due process. The Sixth Circuit also found no fault with the district court for basing its sanctions decision on a consideration of written witness statements. *Id.*

In their post-hearing brief, Defendants make no specific argument concerning the use of hearsay documents at a sanctions hearing. Rather, Defendants rely generally on a contention that it would violate their due process rights for the court to rely on the Popke Declarations when Defendants have not had an opportunity to cross-examine Mr. Popke. Regardless of the legal merits of this position, the factual predicate is wholly without merit. Significantly, Defendants' counsel agreed on the record at the hearing on September 21, 2009, that Plaintiff's counsel had provided him with several dates upon which he could depose Mr. Popke in Texas. However, Defendants' counsel wanted to "speak" with Mr. Popke before deposing him. Mr. Popke apparently did not respond to written correspondence from Defendants' counsel and not having "spoken with" Mr. Popke, Defendants' counsel did not take the opportunity to depose him. Even after the hearing on

12

sanctions when the court instructed Plaintiff to provide additional deposition dates, Defendants have not planned to depose Mr. Popke. The bottom line remains that Defendants had every opportunity to cross-examine Mr. Popke, yet chose not to do so. That was a strategic decision made for reasons which the court can only imagine. In any event, Defendants cannot use their own strategic decision to limit the court's options on sanctions. The court finds that Defendants had the opportunity to cross-examine Mr. Popke through deposition and chose not to do so.

Furthermore, Defendants were on notice of the nature of the allegations based on communication from Plaintiff's counsel prior to the filing of the instant motion on September 2, 2009. Plaintiff filed her expert report on September 9, 2009. Defendants filed a written response on September 10, 2009. Defendants then had the opportunity to be heard and present evidence on two hearing dates of September 18 and 21, 2009. The court concludes, therefore, that Defendants have received due process with respect to the court's consideration of the ultimate sanction of striking Defendants' answer.

With respect to whether the court can rely on the Popke Declarations, Plaintiff points to Federal Rule of Civil Procedure 43(c) which governs the taking of testimony as evidence on a motion and provides: "When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." Fed. R. Civ. P. 43(c). In *Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d

AO 72A
(Rev.8/82)

240 (D. Me. 2008), the court considered the application of Rule 43(c). There, the magistrate judge had ordered expedited discovery based on information provided in a declaration by one of the plaintiff's employees. Defendants filed a motion to vacate that order and strike the declaration arguing that it was improper for the magistrate judge to have relied on the declaration because it contained information gathered by unlicensed private investigators and was hearsay. The court rejected defendant's Rule 43(c) argument finding that because "Rule 43(c) allows a court to consider hearsay in the form of affidavits and depositions when deciding a motion within its scope, the rule undermines the Defendants' argument that Federal Rule of Evidence 802 excludes the [] Declaration as hearsay." *Id.* at 255 & n.19 (also noting that Rule 1101(b) is not "exclusive and exhaustive" list). The court noted, for example, that even though not specifically referenced in Rule 1101(d), affidavits and other hearsay materials are often received in preliminary injunction hearings. *Id.* (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986) ("dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding").

The only case Defendants cite to contest Plaintiff's argument is *In re Corrugated Container Antitrust Litigation*, 756 F.2d 411, 415 (5th Cir. 1985). Defendants describe this case as "holding that a transcript of an interview was properly excluded from trial because

14

'even given under oath . . . such interviews lack the expurgation of confrontation and cross examination.'" *See* Reply [161], at 6. The relevance of this case and holding escapes the court as the case primarily addresses issues of immunity and whether certain interviews could be used for the purposes of impeachment.

In sum, therefore, the court concludes that Defendants have received all process due to them. The court also determines that pursuant to Federal Rule of Civil Procedure 43(c), it may consider the Popke Declarations in ruling on Plaintiff's motion for sanctions.

**B.     Signature**

Based on the evidence before it, the court concludes that the signature on the Popke Statement is not Mr. Popke's. Plaintiff's highly qualified expert testified that the signature on the Popke Statement contained numerous significant differences from the known signatures of Mr. Popke. Mr. Shiver opined based on his analysis that it was "highly probable" the signature was forged. Mr. Shiver stated his conclusion would have been of the highest level of certainty, but for the fact that he did not have an original of the Popke Statement to consider. As the Popke Statement was produced by Defendants, the fact that the original is no longer available weighs against Defendants. The court finds Mr. Shiver to be well-qualified and his testimony highly persuasive. Even to a lay person, there are significant differences in appearance between the signature on the Popke Statement and those on the Popke Declarations.

AO 72A
(Rev.8/82)

In contrast, Defendants' first expert claims that the signature on the Popke Statement is "disguised" because of certain "habits" that she discerned from the known signatures of Mr. Popke. However, these supposed "habits" are features of the writing that are equally present and not present. Therefore, they cannot be "habits" at all and certainly cannot be habits which would support a finding that the same person had formed the signatures. The court also notes that the testimony and qualifications of Defendants' first expert witness were largely discredited on cross-examination.[1]

The best Defendants' second expert could opine was that his analysis was "inconclusive" as to whether Mr. Popke had signed the Popke Statement. Defendants' second expert also testified that the first part of the signature contains pen pressure points indicating the signature was carefully done. This opinion directly contradicts the testimony of Mr. Anderson and Mr. Pefanis that Mr. Popke signed the statement in a "rushed" fashion. Mr. Anderson's testimony is further called into question by the fact that he claims he did not tell anyone at the company that he was going to purchase a Lexus, yet he had possession of Mr. Pefanis' Porsche to use for trade-in at the time of purchase – a fact which presumably indicates that Mr. Anderson had at least spoken with Mr. Pefanis about getting a new car.

Mr. Popke, himself, has testified that he did not sign the document in question and

---

[1]The court rejected Plaintiff's motion to strike Ms. DeBerry's testimony for lack of qualification. Although the court recognized that Ms. DeBerry did not have any formal education, the court noted that she had an understanding of the process beyond that which a lay person would.

16

that Mr. Pefanis and Mr. Bonertz had pressured him to sign the document even to the point of threatening his continued employment. Defendants have proffered no reason as to why Mr. Popke would be untruthful on this matter. Again, Defendants' refusal to depose Mr. Popke also provides the court with some inference of what Defendants believe his testimony would be. Further, the veracity of Mr. Popke's declarations is bolstered by the strength of Mr. Shiver's testimony that the signature on the Popke Statement is not Mr. Popke's.

Finally, it has not escaped the court's attention that Mr. Bonertz declined to testify at the hearing, despite the fact that Defendants' pleadings had relied on his proffered testimony that he had witnessed Mr. Popke sign the statement and he was announced as a witness at the hearing.

Having concluded that Mr. Popke's signature on the Popke Statement is a forgery, the court next turns to consideration of the appropriate sanction.

### C. Sanctions

Defendants have argued only that there is a fact question as to whether the signature on the Popke Statement was forged. Defendants have not made any argument that even if the court were to find the document to be a forgery, there would be some sanction lesser than default that would be appropriate. Plaintiff strenuously argues that no other court having determined that a forgery was presented by a party has imposed any sanction less than striking of the answer.

17

When considering the issue of "fraud on the court," this court has previously held:

> A court may use its inherent powers to preserve the integrity of the judicial process and prevent the perpetration of fraud on the court. *See generally Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). Although the Eleventh Circuit touched upon the issue in *Zocaras* [*v. Castro*, 465 F.3d 479 (11th Cir. 2006)], where the plaintiff filed a § 1983 excessive force complaint under a false name, the court never specifically addressed this issue as a "fraud on the court." The First Circuit defines fraud on the court as "where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989).
>
> Other circuits have discussed the appropriateness of dismissal in light of such fraud. *See, e.g., Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (where court determined that party concealed documents and lied about their existence for years, court considered facts of (1) public's interest in expeditious resolution of litigation, (2) court's need to manage its dockets, (3) risk of prejudice to party seeking sanctions, (4) public policy favoring disposition of cases on their merits, and (5) the availability of less drastic sanctions, before imposing dismissal under inherent powers); *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 462-63 (4th Cir. 1993) (where EPA administrator misrepresented academic achievements and government attorneys obstructed defendants' efforts to investigate discrepancies, court applied multi-factor test of (1) degree of wrongdoer's culpability, (2) extent of client's blameworthiness, (3) prejudice to judicial process and administration of justice, (4) prejudice to victim, (5) availability of other sanctions, "to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future," and (6) public interest, to determine appropriateness of dismissal).

*Eagle Hospital Physicians, LLC v. SRG Consulting, Inc.*, 2007 WL 2479290, at *3 (N.D. Ga. Aug. 28, 2007) (also citing *Jackson v. Microsoft Corp.*, 78 Fed. Appx. 588 (9th Cir.

AO 72A
(Rev.8/82)

2003); *Perna v. Electronic Data Systems, Corp.*, 916 F. Supp. 388 (D.N.J. 1995); *Lipin v. Bender*, 84 N.Y.2d 562 (N.Y. 1994)), *aff'd*, 561 F.3d 1298 (11th Cir. 2008).

The court agrees with Plaintiff that there is no sanction short of striking of the answer to adequately address the issue of fabricated evidence. The plethora of cases cited by Plaintiff in her motion support the use of the "ultimate" sanction when dealing with manufactured evidence. *See* Plaintiff's Motion, at 10-15. The use of a forged document in defense of a lawsuit prejudices both the opposing party and the judicial system itself. Furthermore, there is no way to adjudicate Plaintiff's claims and Defendants' defenses without scrutinizing the August 16, 2007, incident and the evidence supporting or conflicting with Plaintiff's contentions. Therefore, the court finds that the only appropriate sanction is striking of Defendants' answer.

### III. Conclusion

The court GRANTS Plaintiff's motion for sanctions [149]. The Clerk of the Court is DIRECTED to STRIKE Defendants' answer.

The parties are DIRECTED to appear on Tuesday, October 13, 2009, for a trial on damages.

**IT IS SO ORDERED** this 2nd day of October 2009.

                           /s  J. Owen Forrester
                           J. OWEN FORRESTER
             SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)