# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Evangelina Forsberg,                    :
                                        :
            Plaintiff,                  :
                                        :
      v.                                :      CIVIL ACTION NO.
                                        :      1:07-cv-03116-JOF
James Pefanis, et al.,                  :
                                        :
            Defendants.                 :
                                        :

## OPINION & ORDER

This matter is before the court on Defendants' joint motion for a new trial pursuant to Rule 59 or in the alternative for remittitur and motion to enforce statutory cap [197] and Defendants' motion for an extension of time to file a reply brief [200].

## I.    Background

On October 16, 2009, a jury entered a verdict in favor of Plaintiff and against Defendants in the following manner:

| Claim | Compensatory Damages | | Punitive Damages | |
|---|---|---|---|---|
| Assault and Battery | Pefanis | $500,000 | Pefanis | $500,000 |
| | AME | $250,000 | AME | $250,000 |
| | GMMC | $250,000 | GMMC | $250,000 |
| False Imprisonment | | $0 | | $0 |
| Invasion of Privacy | | $0 | | $0 |
| Negligent Retention | AME | $50,000 | AME | $2,000,000 |
| | GMMC | $50,000 | GMMC | $1,000,000 |
| Sexual Harassment (Title VII) | AME | $25,000 | AME | $500,000 |
| | GMMC | $25,000 | GMMC | $500,000 |
| Retaliation (Title VII) | AME | $250,000 | AME | $1,000,000 |
| | GMMC | $250,000 | GMMC | $1,000,000 |
| § 1985(2) | | $0 | Pefanis | $200,000 |
| | | | AME | $150,000 |
| | | | GMMC | $150,000 |
| Net lost wages | $50,000 | | | |

The Clerk of the Court entered judgment on October 20, 2009. After trial, Defendants obtained additional counsel and filed the instant motion for a new trial on November 3, 2009. Plaintiff responded to Defendants' motion. Defendants have not yet filed a reply brief because they are awaiting the transcript of the trial. Defendants aver that because Plaintiff has argued that Defendants misrepresent the record with respect to certain

2

claims, Defendants should have an extension of time to reply until the transcript is prepared. The court finds that none of the issues raised in Defendants' motion for a new trial relies on a technical reading of the transcript, but rather deals with claims raised and general evidence presented at trial. Therefore, neither party is prejudiced by the court's ruling at this time based on the motion and response. The court determines that the parties are better served by the court's order on this motion sooner rather than later. Therefore, the court DENIES Defendants' motion for an extension of time to file a reply brief [200].

Defendants raise 14 separate claims in their motion:

1.      the sanction of default entered by the court was improvidently granted because there was not sufficient evidence the signature was forged or by whom it was forged, the Popke affidavit was never admitted as evidence and is hearsay, the penalty was disproportionate to the offense, Plaintiff suffered no prejudice because of the existence of the document, and the court failed to consider lesser sanctions;

2.      by striking the answer, the court deprived the corporation of its ability to demonstrate that it had no liability for the conduct of Pefanis;

3.      the default created an impossibly unlevel playing field for damages and deprived Defendants of the opportunity to argue that Plaintiff also engaged in "horseplay" at the office;

AO 72A
(Rev.8/82)

4.    AME and Georgia Mutual were treated as two separate corporations at trial and for the purposes of awarding damages, but Plaintiff's complaint treated them as alter egos;

5.    Plaintiff presented no evidence on the issue of pain and suffering, and at the very least, a remittitur should occur because the jury's award exceeded the amount established by the evidence;

6.    Georgia Mutual does not have enough employees to be sued under Title VII;

7.    the jury's award on sexual harassment and retaliation exceeds the $50,000 statutory cap under § 1981a;

8.    the punitive damages award was excessive because (a) the compensatory damages do not support the level of punitive damages, (b) there was no clear and convincing evidence on the state law claims, and (c) Plaintiff did not show that the corporations were primary tortfeasors that could be punished for assault and battery because the corporations had already been punished for negligent retention;

9.    because there was no evidence of the income of Pefanis, AME, or Georgia Mutual, there is no basis for the award of punitive damages against them;

10.   because the jury awarded no damages for § 1985(2), it was improper for the jury to award $500,000 in punitive damages on this claim;

4

11. there was no factual basis for the jury's award of lost wages and benefits for negligent retention, retaliation, and assault and battery;

12. there was no evidence to support Plaintiff's allegations of Pefanis' misconduct, so the court should have directed a verdict on the negligent retention claim against the corporate defendants;

13. Pefanis was an equal opportunity offender and therefore his conduct was not actionable under Title VII; and

14. the award for negligent retention of Pefanis cannot be supported if judgment is also entered against Pefanis personally for the underlying conduct because Pefanis cannot be expected to fire himself.

## II. Discussion

### A. Motions

A Rule 50(b) motion for judgment as a matter of law on a particular issue addresses whether there is a legally sufficient evidentiary basis for a reasonable jury to find for the non-movant on that issue. The court is required to review all of the evidence in the record, drawing all reasonable inferences in favor of the non-movant and not second-guessing the jury. *See*, *e.g.*, *Akouri v. State of Florida Department of Transportation*, 408 F.3d 1338, 1343 (11th Cir. 2005); *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001). "A motion under Rule 50(b) is not allowed unless the movant sought

5

relief on similar ground under Rule 50(a) before the case was submitted to the jury." *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2617 n.5 (2008); *Crawford v. Andrew Systems, Inc.*, 39 F.3d 1151, 1154 (11ᵗʰ Cir. 1994). Here, Defendants did not move under Rule 50(a) during trial either at the close of Plaintiff's evidence or at the close of Defendants' case. To the extent that Defendants' arguments go to the sufficiency of the evidence, therefore, they are improper. Nonetheless, the court addresses them below.

Federal Rule of Civil Procedure 59 provides the trial court with discretion to grant a new trial. The grounds for granting a new trial are not set forth in the rules, but Rule 59(a) authorizes the grant "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *Id.* These could include prejudicial error of law, verdict against the weight of the evidence, or an excessive jury award. *See, e.g., Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11ᵗʰ Cir. 1999). It is "critical," however, that the judge not "merely substitute his judgment for that of the jury." *See Lipphardt*, 267 F.3d at 1187. A court may also "order" a remittitur, that is if the court "believes the jury's verdict is excessive, [it] may order a new trial unless the plaintiff agrees to remit a portion of the jury's award." *Id.* at 1328-29. *See also Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11ᵗʰ Cir. 2008) ("As a general rule, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.").

6

**B.      Default Judgment (Argument No. 1)**

Defendants argue that the court erred in entering default judgment against Defendants Pefanis, AME and Georgia Mutual because there was not sufficient evidence the signature on the Popke Statement was forged or by whom it was forged, the Popke Statement was never admitted as evidence and is hearsay, the penalty was disproportionate to the offense, Plaintiff suffered no prejudice because of the existence of the document, and the court failed to consider lesser sanctions.

The court rejects Defendants' argument that it was not proper for the court to sanction Defendants over the Popke Statement because (a) the affidavit was never proffered as evidence; (b) no relief, such as summary judgment, was sought on its basis; and (c) as an unsworn out of court statement, it could not be used as evidence.  To accept Defendants' argument would mean that parties would be permitted to exchange false documents in discovery without impunity.  Furthermore, it is simply not true that the statement was never proffered to the court.  Plaintiff alleged that Defendant Pefanis grabbed her crotch in front of David Popke.  Throughout the litigation, Defendants have made the centerpiece of their defense a denial of Plaintiff's factual allegations, particularly a denial that the August 16, 2007, crotch-grabbing incident ever happened.  Defendants listed Mr. Popke as a witness in their initial disclosures.  Docket Entry [17].  He was listed as a witness again on Defendants' Pre-Trial order.  Docket Entry [119], attachment F-2, at 3.  Defendants' exhibit

7

list in the Pre-Trial order contains the Popke Statement. *Id.*, attachment G-2, No. 5. In their response to Plaintiff's First Motion in Limine, Defendants assert that although Plaintiff claims Defendant Pefanis grabbed her crotch on August 16 "in front of a number of employees . . . those employees will all testify that no such thing occurred or that they did not witness any such event." *See* Docket Entry [133], at 5. Virtually the same statement is repeated in Defendants' Revised Statement of the Case. *See* Docket Entry [145], at 8. Presumably, "all" of "those employees" includes Mr. Popke.

The undated Popke Statement presented by Defendants says "I do not recall the incident Ms. Forsberg is referring to in the letter dated October 1, 2007." *See* Exh. A, Plaintiff's Motion for Sanctions, Docket Entry [149] (Plaintiff's attorney wrote a letter on October 1, 2007, describing her allegations of the August 16, 2007, incident.). Defendants also offered the declaration of Mildred Hinton, an AME Underwriting Manager and Assistant to Defendant Pefanis. Ms. Hinton testified that on that day, both Plaintiff and Defendant Pefanis were in her office "earlier in the day" and she did not notice inappropriate behavior between them. The only physical contact she observed was Defendant Pefanis putting his hands on Plaintiff's shoulders. *See* Hinton Decl., ¶¶ 1-2, submitted with Defendants' Motion for Summary Judgment, Docket Entry [73]. Carey Skogen also provided a declaration for Defendants and stated that she was sitting by Ms. Hinton's desk on August 16, 2007, and saw nothing inappropriate between Plaintiff and Defendant Pefanis;

8

that Defendant Pefanis only put his hands on Plaintiff's shoulders. *See* Skogen Decl., ¶ 7, submitted with Defendants' Motion for Summary Judgment, Docket Entry [73]. It is not surprising that an attorney evaluating Plaintiff's case would look to Mr. Popke as a more neutral witness not subject to impeachment as he no longer worked for AME and had no financial ties to the company. An attorney would have a different perception of a neutral witness who testified that the incident did not happen, particularly when Plaintiff's statement of the incident referred specifically to Mr. Popke being pulled into the office by Defendant Pefanis. *See* Forsberg Decl., ¶ 18 (submitted with Plaintiff's Response to Defendants' Motion for Summary Judgment, Docket Entry [73]). Plaintiff never testified that Ms. Hinton or Ms. Skogen witnessed the incident, and it is not clear from their affidavits that they were seeing the interaction between Plaintiff and Defendant Pefanis that Plaintiff described.

Plaintiff was required to plan the prosecution of her lawsuit around Defendants' assertion that she made up the August 16 crotch-grabbing incident, as well as Defendants' proffer of the Popke Statement. And, in fact, the forgery was discovered because Plaintiff took the time and expense during trial preparation to hire a private investigator to locate and interview Mr. Popke in Texas. These efforts on the part of Plaintiff belie Defendants' argument that Plaintiff suffered no prejudice due to the existence of the document.

AO 72A
(Rev.8/82)

Nor does the relevant case law support the notion that a forged document would have to be proffered as evidence to the court before it could form the basis of a sanctions finding. In *Pope v. Federal Express Corp.*, 974 F.2d 982 (8ᵗʰ Cir. 1992), the plaintiff alleged that she had been sexually harassed by her supervisor. During the course of discovery, the plaintiff presented a document allegedly written by her supervisor in support of her claim. After receiving expert testimony and other documentary evidence, the district court determined that the note had not been written by the plaintiff's supervisor, but rather was a "cut-and-paste" job. The district court further concluded that the plaintiff had lied when asked about the circumstances of the document during a deposition. The Court of Appeals affirmed the district court's decision to dismiss the plaintiff's Title VII claim. "The dismissal of Pope's suit was based on the district court's finding that manufactured evidence and perjured testimony had been introduced in an attempt to enhance the case through fraudulent conduct. When a litigant's conduct abuses the judicial process, the Supreme Court has recognized dismissal of a lawsuit to be a remedy within the inherent power of the court." *Id.* at 984.[1] In *Pope*, like the case here, the plaintiff had merely turned the document over in discovery.

In *Sun World v. Lizarazu Olivarria*, 144 F.R.D. 384 (E.D. Cal. 1992), the plaintiff alleged that it and the defendant had entered in to two contracts whereby Sun World became

---

[1]The district court had also awarded monetary sanctions under Rule 11, but the Court of Appeals vacated that portion of the district court's order. *See* 138 F.R.D. 675 (W.D. Mo. 1990).

AO 72A
(Rev.8/82)

the exclusive marketing agent for grapes grown by Lizarazu. Sun World turned over certain additional grapes and money in anticipation of a joint venture that never materialized. Sun World sued for a return of those items. The defendant responded that at some point the parties had made an agreement to terminate their relationship and memorialized this in a document entitled Notice of Termination. The import of the Notice of Termination was that the parties had released each other from claims. When asked to show cause that the document was not a fraud, the defendant spun a tale of how the document came about and why the document was not a forgery.

Neither the defendant's answer nor his counterclaim directly referred to the Notice of Termination. But his fourth affirmative defense indicated his intention to rely on this theory by stating that the plaintiff had waived its rights to file suit. At the show cause hearing, the district court directed further discovery on the source of the document. During that discovery, the defendant first avoided his deposition and then pled the Fifth Amendment in response to all questions. Finally, the defendant's counsel informed the court that the Notice of Termination was fraudulent.

The district court granted the plaintiff's motion for sanctions in the form of default judgment being entered against the defendant for submitting the fraudulent document and for committing perjury in furtherance of the fraud. The court noted that had "the fraudulent document not been called into question, the court does not doubt that [the defendant] would

11

have attempted to use it, an integral document, to obtain favorable judgment on [the plaintiff's] complaint." *Id.* at 389. The court continued:

> At the evidentiary hearing counsel argued that because no court order had been violated the lesser sanction of only dismissing Lizarazu's counterclaim would be appropriate. The ability to impose the sanction of dismissal and default judgment does not depend upon whether or not a court order has been violated. As noted by the court at that time, it need not order Lizarazu to refrain from submitting false documents or perjuring himself in order for those acts to be punishable by dismissal and the entry of default judgment. The legal obligation to refrain from committing such acts is imposed upon every party to a lawsuit.

*Id.* at 389-90. The Notice of Termination had not been submitted in conjunction with any dispositive motion or proffered to the court in some other "affirmative" way. Rather, the document had simply been exchanged in discovery.

Finally, in *Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D. Wash. 2002), defendant's counsel deposed the plaintiff. During the deposition, the plaintiff turned over documents that were proprietary to defendant. He also turned over "documents which had been altered and/or partially destroyed." Defendant brought a motion to dismiss several days after the deposition and the court granted the motion under its inherent powers to sanction finding that the plaintiff had "perpetrated in a lengthy series of elaborate misrepresentations and lies to both the Court and counsel." The court noted that dismissal was warranted where "a party has engaged deliberately in deceptive practices that undermine the integrity of the judicial proceedings." *Id.* at 432. The Ninth Circuit affirmed

12

the district court's finding that lesser sanctions would not be effective because the plaintiff's "deception and misconduct occurred throughout his deposition and the first and second evidentiary hearings." 78 Fed. Appx. 588, 589 (9th Cir. 2003) (noting that the plaintiff's "deceptive acts and fraudulent testimony related to and would affect matters in controversy because his testimony was crucial to the underlying race discrimination claim").

Defendants next contend that because there is no evidence of who forged the document, the court could not impose the sanction of default against Defendants. This argument ignores all of the evidence adduced at the evidentiary hearings before the court on September 18 and 21, 2009. At those hearings, Defendants argued that the Popke Statement was an authentic document. To be sure, Defendants varied in their contention that Mr. Popke signed the document in a "hurried" fashion or signed it in a manner intended to "disguise" his handwriting, but Defendants never offered to the court the theory that the document was a forgery perpetrated by individuals other than Defendant Pefanis or those in control of the Defendant corporations. In fact, Defendant Pefanis, Robert Anderson, and Phyllis Lee, all testified to the scene in AME's offices when Defendant Pefanis asked Mr. Popke to sign a statement that Mr. Popke had not witnessed the August 16, 2007, incident alleged by Plaintiff. Defendants' witnesses spoke specifically about who had the document, when, and where. Thus, there were no fact issues as to where the Popke Statement came from, rather only whether David Popke actually signed it.

As the court noted in its October 2, 2009, order, clear and convincing evidence was adduced at the two-day hearing that the Popke Statement was forged, beginning with the strong testimony of Plaintiff's expert Farrell Shiver, a highly experienced forensic document examiner, who opined it was "highly probable" the signature was forged. The only reason Mr. Shiver could not state his opinion with complete certainty is that Defendants, interestingly, did not retain the original of the Popke Statement. Further, the court found it particularly significant that despite being given the opportunity to cross-examine Mr. Popke about the statement, Defendants decided not to. Finally, although Mr. Bonertz provided an affidavit in response to Plaintiff's motion for default sanction, Mr. Bonertz decided not to testify at the hearing.

Whether the document was forged was not an issue of liability related to Plaintiff's causes of actions. Rather, the court held the hearing to consider Plaintiff's motion for default sanction under the court's inherent powers to manage its own affairs. *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). There is no entitlement to a jury on a question of the court's inherent powers. Further, a trial court has the discretion to decide factual disputes concerning the authenticity of evidence. *See Gilmer v. Colorado Institute of Art*, 12 Fed. Appx. 892, 895 (10th Cir. 2001). Contrary to Defendants' arguments, the management of the court's docket relates not only to issues of time and efficiency; it relates to the integrity of the judicial system in general. The entirety

AO 72A
(Rev.8/82)

of this litigation has been fraught with issues of veracity and candor to the court – matters that have distracted the court and the parties from determinations of the merits of Plaintiff's complaint.

Defendants are absolutely incorrect in their assertion that the court failed to consider sanctions lesser than default. *See* Order, dated Oct. 2, 2009, at 19 ("The court agrees with Plaintiff that there is no sanction short of striking of the answer to adequately address the issue of fabricated evidence."). "The use of a forged document in defense of a lawsuit prejudices both the opposing party and the judicial system itself. Furthermore, there is no way to adjudicate Plaintiff's claims and Defendants' defenses without scrutinizing the August 16, 2007, incident and the evidence supporting or conflicting with Plaintiff's contentions. Therefore, the court finds that the only appropriate sanction is striking of Defendants' answer." *Id.* Furthermore, Defendants never argued during the hearing or post-hearing briefing that a sanction of default would be inappropriate in the circumstances of a forgery. They simply argued that the document was not forged. The court found otherwise. Having found that the document was forged, the court considered this an issue of "fraud on the court" and considered various factors on the appropriateness of dismissal. *Id.* at 18.

Defendants offer now that the court could have prohibited the use of the document at trial, but that "sanction" does nothing to preserve the integrity of the judicial system or deter other litigants from such behavior. It is no punishment simply to rule that a party does

15

not have a right to use a document that it falsely prepared. The party never had the right to use that document in the first place. Having determined that the issue was one of integrity with the judicial system and related to such a vital incident in Plaintiff's allegations, the court concluded that only the sanction of default would suffice.[2]

## C. Verdict Issues

### 1. Argument No. 5

Defendants aver that Plaintiff produced no evidence at trial on her pain and suffering and alternatively that the court should order a remittitur because the jury's award exceeded the amount established by the evidence admitted at trial. It is not factually correct to state that Plaintiff offered no evidence at trial as to her pain and suffering. Plaintiff did take the stand and testified about the incident and how it affected her. The court can understand that Defendants might make some argument as to the quality and quantity of that evidence, but the court finds there was sufficient evidence from which a jury could have concluded Plaintiff suffered.

Defendants also argue that "there was no evidence to support the verdicts that the Plaintiff suffered separate 'pain and suffering' based on the separate torts of assault and battery *and* negligent retention *and* sexual harassment *and* retaliation." *See* Motion for New

---

[2]Defendants also made no argument at the hearing that it would not be appropriate to strike the answer of the corporate Defendants along with Defendant Pefanis. The court addresses below the relationship of Defendant Pefanis with the corporate defendants.

AO 72A
(Rev.8/82)

Trial, at 8. As the court describes more fully below, the court expressed this specific concern at the charge conference, and the parties and court were careful to craft the jury verdict form so that impermissible "double recovery" did not occur.

The court disagrees with Defendants' assertion that *Copley v. BAX Global, Inc.*, 97 F. Supp. 2d 1164, 1172 (S.D. Fla. 2000), provides some kind of bench mark or limit for damages on emotional distress at $150,000. The facts in *Copley* were not as egregious as the facts alleged in the complaint here. Further, in *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003), the Eleventh Circuit found that an award of $500,000 in compensatory damages to each plaintiff librarian was not an abuse of discretion in a reverse discrimination suit. "Although compensatory damages must be proven, general compensatory damages, as opposed to special damages, need not be proved with a high degree of specificity and may be inferred from the circumstances. A plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms. Humiliation and insult are recognized, recoverable harms and a plaintiff's own testimony of embarrassment and humiliation can be sufficient to support an award for compensatory damages." *Id.* at 1359 (quotations and citations omitted). "The standard of review for awards of compensatory damages for intangible, emotional harm is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *Id.*

17

Here, the jury awarded Plaintiff a total of $1,650,000 in compensatory damages, which will be reduced to $1,150,000 because of Title VII's statutory caps (as discussed below). The court finds that this award does not exceed an amount established by the evidence. The factual recitation of Plaintiff's complaint is replete with reprehensible acts by Defendants, including Defendant Pefanis pushing Plaintiff onto her back and climbing on her to "dry hump" her during a meeting with co-workers and a client; pinning Plaintiff against a wall in the hallway to simulate forced sex upon her; in front of other people grabbing and holding her vagina and describing it as "really teeny." The factual circumstances of these incidents – that they include both verbal harassment as well as numerous instances of physical touching and were done in front of other people – render the jury's verdict reasonable.

2.    Argument No. 7

Defendants argue that the jury's award on sexual harassment and retaliation exceeds the Title VII statutory cap codified at § 1981a(3)(A) (for companies with between 14 and 101 employees, the "sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed" $50,000 per complaining party).

18

There is no dispute that for a company (or joint employer, in this case), the size of Defendants', the statutory cap for damages under Title VII is $50,000.

Here, the jury awarded Plaintiff $50,000 in compensatory damages and $1,000,000 in punitive damages for her sexual harassment claim, as well as $500,000 in compensatory damages and $2,000,000 in punitive damages on her retaliation claim under Title VII. Therefore, the court must write the jury's total award of $3,550,000 on the Title VII claims down to $50,000. In this respect, the court grants Defendants' motion for a new trial or in the alternative remittitur.

Plaintiff, however, makes a further argument with respect to the retaliation claim. As the parties discussed in conference when creating the jury verdict form, the court had a concern that the jury not award duplicate damages under various causes of action for the same pain and suffering incurred by Plaintiff. To prevent that, the verdict form was created in a "cascading" fashion beginning with Plaintiff's assault and battery claim which was the cause of action most closely associated with Plaintiff's most serious claim that Defendant Pefanis sexually assaulted her on August 16, 2007, by grabbing her in the crotch area and holding her. The jury made its damages award on assault and battery. On the next claim of false imprisonment, the verdict form added the following language:

> Any damages you award on a claim must be supported by evidence relating to that claim and damages for one claim may not be duplicative of damages awarded in another claim. Plaintiff may not recover twice for the same injury under alternative theories of liability. A party is entitled to be made whole,

19

but not entitled to recover more than once for the same injury. If you believe you have already awarded Plaintiff all damages that would cover the conduct of this cause of action, please proceed [to the next question].

*See* Verdict Form, at 3, 5, 7, 9, 11, and 13 (adding this language is each subsequent cause of action considered by the jury).

The verdict form proceeded through the state law claims, then addressed sexual harassment in violation of Title VII, retaliation in violation of Title VII, and threats and intimidation in violation of section 1985(2). After awarding $500,000 in compensatory damages and $2,000,000 in punitive damages on the Title VII retaliation claim, the jury returned no award on compensatory damages for the § 1985(2) claim, but $500,000 in punitive damages. Plaintiff asks that the court shift the $500,000 the jury attributed to the Title VII retaliation (and which must be written down to zero by virtue of the statutory cap) to the § 1985(2) claim. Plaintiff asserts that the only reason the jury did not award any compensatory damages on the § 1985(2) claim was the instruction on the jury verdict form to avoid "double recovery." Had the jury verdict form been in a different order, the jury would have awarded compensatory and punitive damages on § 1985(2) and then nothing on Title VII retaliation.

Plaintiff may be correct that Title VII retaliation and § 1985(2) are simply different theories of recovery for the same set of March 2008 wrongful acts. *See Ague v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336, 1344 n.2 (N.D. Ga. 2009) (Martin, J.) (noting that

plaintiff's § 1985(2) retaliation and Title VII claims arose out of same set of underlying facts). Plaintiff may also be correct in her surmise that the jury failed to award compensatory damages on her § 1985(2) claim only because of the order of the jury verdict form. The court, however, does not agree that either of these possibilities means that the court should exercise any discretion to "shift" the jury's award of compensatory damages on the Title VII retaliation claim to the § 1985(2) claims.

Plaintiff cites *Bradshaw v. School Bd. of Broward County*, 486 F.3d 1205 (11th Cir. 2007), in support of her argument. There, the plaintiff raised claims under both Title VII and Florida's Civil Rights Act. The court noted that Title VII and the Florida statute had nearly identical language and "the very same conduct violates both statutes." *Id.* at 1207. "So if Title VII cannot remedy the full extent of her injury because of its damage cap, then the remaining portion of her injury should be remedied as much as possible under the Florida [Civil Rights Act], and vice verse." *Id.* at 1207-08. The jury awarded the plaintiff $500,000 in compensatory damages. Her Title VII claim was capped at $300,000 due to employer size. The statute describing her Florida state law claim limited total recovery against a state or its subdivision to $100,000. The Eleventh Circuit found that the plaintiff could only recover $300,000 and nothing more under the Florida state law claim because the $100,000 limit had already been paid out. *Id.*

21

The court finds the circumstances of *Bradshaw* distinguishable enough that the case cannot support an argument that any damages awarded under Title VII retaliation but barred by the statutory cap should be shifted to § 1985(2) when the jury did not award any damages under § 1985(2). Similarly, *Pavon v. Swift Transportation Co.*, 192 F.3d 902, 910 (9th Cir. 1999) and *Broadnax v. City of New Haven*, 141 Fed. Appx. 18 (2d Cir. 2005), cited by Plaintiff, relate more directly to closely associated Title VII and § 1981 claims. Further, in *Pavon*, the jury verdict form did not distinguish among his § 1981, Title VII, and wrongful discharge claims and therefore does not directly speak to the issue here.

    3.    <u>Argument No. 10</u>

Related to the above, Defendants argue that the jury did not award any compensatory damages for § 1985(2), but then improperly awarded $500,000 in punitive damages on the § 1985(2) claim.

Defendants offer no additional context for this argument and the court is left to wonder. Defendants could be arguing that it is improper to award punitive damages when no compensatory damages have been awarded. This general proposition has some merit. *See*, *e.g.*, *California v. Altus Financial S.A.*, 540 F.3d 992, 1002 (9th Cir. 2008) (affirming vacatur of punitive damages award where jury awarded "$0" in compensatory damages because verdict showed plaintiff did not suffer "actual damages" necessary to sustain punitive damages award); *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262,

AO 72A
(Rev.8/82)

281-84 (3d Cir. 1995) (vacating punitive damages award for tortious interference claim where jury found actual harm but awarded no compensatory damages.) However, in the instant circumstances, the legal question is more complicated than might appear at first glance. As the Second Circuit has noted, in general there is no consensus at common law as to the appropriateness of a punitive damages award absent compensatory or nominal damages. *See Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 358 (2d Cir. 2001). *See also De Jesus Nazario v. Morris Rodriguez*, 554 F.3d 196, 203-04 (1st Cir. 2009); *La. ACORN Fair Housing v. LeBlanc*, 311 F.3d 298, 301 (5th Cir. 2000) ("there is no established federal common law rule that precludes the award of punitive damages in the absence of an award of compensatory damages").

Even more relevant to Plaintiff's § 1985(2) claim here, numerous circuit courts have not required proof of actual or nominal damages to support a punitive damages award in civil rights cases. *See Abner v. Kansas City S. R.R. Co.*, 513 F.3d 154, 160 (5th Cir. 2008) ("We agree with the conclusions of several of our sister circuits that a punitive damages award under Title VII and § 1981 need not be accompanied by compensatory damages."); *Timm v. Progressive Steel Treating*, 137 F.3d 1008 (7th Cir. 1998) (punitive damages available absent actual damages in Title VII or analogous cases); *Alexander v. Riga*, 208 F.3d 419 (3d Cir. 2000); *Cush-Crawford*, 271 F.3d 252 (2d Cir. 2001) ("to make enforcement of the jury's award of punitive damages turn on whether the jury also awarded

23

purely symbolic nominal damages carries a likelihood of defeating the jury's intention as a result of confusion").

In fact, in *Davis v. Locke*, 936 F.2d 1208 (11th Cir. 1991), the Eleventh Circuit held that "punitive damages may be awarded in a § 1983 action even without actual loss." *Id.* at 1214 (citing *Wilson v. Taylor*, 658 F.2d 1021, 1033 (5th Cir. Unit B. Oct. 1981)). "An award of punitive damages is authorized in a civil rights case if 'the defendant was motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights.'" *Id.* (quoting *Anderson v. City of Atlanta*, 778 F.2d 678, 688 (11th Cir. 1985)).

Defendants have pointed to no particular Eleventh Circuit authority which would direct that an award of punitive damages on a § 1985(2) claim is improper without an award of compensatory damages and the court has found none. Further, while the court has held above that it will not "shift" the jury's award of compensatory damages on Title VII retaliation to Plaintiff's § 1985(2) claim, the Title VII compensatory award could potentially support an award of punitive damages on § 1985(2).

In the end, without more than a one sentence argument by Defendants, the court will not strike the jury's award of punitive damages under § 1985(2).

AO 72A
(Rev.8/82)

4.    <u>Argument No. 8</u>

Defendants argue that the punitive damages awarded were improper in three respects: (a) the punitive damages were excessive with respect to the compensatory award and therefore must be reduced, (b) Plaintiff presented no clear and convincing evidence on the state law claims, and (c) there was no showing at trial that the corporations were primary tortfeasors to be punished for assault and battery as they were already punished for negligent retention.

"The Supreme Court has recognized constitutional principles of due process prohibit the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). In *Gore*, the Supreme Court instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Bogle v. McClure*, 332 F.3d 1347, 1360 (11th Cir. 2003) (affirming jury award of nearly $2 million in punitive damages to each librarian in reverse discrimination case because racial discrimination was "reprehensible" and defendants attempted to cover up their wrongful act). *See also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F3d. 1261, 1282-83 (11th Cir. 2008)

("Evidence tending to prove a company policy or practice of discrimination can support a sizeable punitive damages award."); *Action Marine, Inc. v. Continental Carbon, Inc.*, 481 F.3d 1302, 1318-23 (11th Cir. 2007) (extensively discussing application of *Gore*).

Defendants argue that a $50,000 award of compensatory damages on Title VII sexual harassment does not support a $1,000,000 punitive damages award; $500,000 in compensatory damages on Title VII retaliation does not support $2,000,000 in punitive damages; and $100,000 in compensatory damages for negligent retention does not support a $3,000,000 punitive award. Defendants contend the multiplier against AME for the negligent retention claim only is 40 times and Georgia Mutual is 20 times.[3]

As the court discussed in *Bogle*, the ratio analysis is "not binding," but rather "instructive." *See* 332 F.3d at 1361 (quoting *Campbell*, 123 S. Ct. at 1524). Nonetheless, the court approved a 4:1 ratio in *Bogle*. *Id.* In *Goldsmith*, the Eleventh Circuit approved a 9.2 to 1 ratio of punitive damages to compensatory damages ($500,000 to $54,321). 513 F.3d at 1283-84 (noting also that court had approved ratio greater than single digit multiplier where compensatory damages were small and need for deterrence was substantial).

Here, the aggregate compensatory damages award was $1,650,000 which the court has written down to $1,150,000 because of Title VII statutory caps. The jury awarded

---

[3]Defendants' argument focuses only on the ratio and multiplier and not "reprehensibility." Based on the facts as alleged to the jury through the default, the court finds without merit any contention that the conduct at issue was not highly reprehensible.

AO 72A
(Rev.8/82)

$7,500,000 in punitive damages which has been written down to $4,500,000. This is a ratio of 3.9:1, well within the single digit "instructive" multiplier.[4] While the jury's award was certainly high and another jury might not award at a similar rate, the court does not find the jury's award to be out of line with awards in similar cases. The allegations in the complaint, which the jury had to accept as true, are reprehensible and support a jury's award of punitive damages at a level designed to severely deter future acts.

On the state law claims, the jury was specifically asked on the jury verdict form whether each of the defendants acted with "specific intent to harm." Under Georgia law, "specific intent to harm" is defined as "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *J.B. Hunt Transport, Inc. v. Bentley*, 207 Ga. App. 250, 255 (1996). Based on the evidence as presented to the jury, the court finds that Plaintiff proffered clear and convincing evidence sufficient for the jury to conclude "specific intent to harm." Further, the parties stipulated at trial that AME was worth $6.8 million. Evidence at trial showed that Defendant Pefanis was a 50% owner of AME. Thus, financial worth information was presented to the jury.

Last, Defendants argue that there was no evidence presented to the jury that the corporations were primary tortfeasors to be punished for assault and battery because the

---

[4]This is without a consideration of attorney's fees, a matter upon which the court has not yet ruled. *See Action Marine*, 481 F.3d at 1320 (holding that attorney's fees may be added as part of the measure of actual damages before comparing punitive for purposes of *Gore*.)

AO 72A
(Rev.8/82)

corporations had already been punished for negligent retention of Defendant Pefanis who Plaintiff contended was responsible for the assault and battery. In *May v. Crane Bros., Inc.*, 276 Ga. 280 (2003), under a theory of *respondeat superior*, the plaintiff sued the Crane Brothers, Inc. after employees of the company physically attacked him while they were digging a well for him. One of the employees was eventually criminally convicted of simple battery. In discussing whether punitive damages were appropriate against the employer, Crane Brothers, the Supreme Court of Georgia reiterated that the purpose of punitive damages is to "punish, penalize, or to deter a defendant." *Id.* at 281. An "award of punitive damages is not intended to punish conduct, but to punish or, as in a case such as this one, to deter a defendant." *Id.* The court further held that "whether the employee has been punished is irrelevant to the goal of deterring the defendant, the employer, from permitting such behavior on the part of its employees." Because the employer had not been criminally punished for the battery charge, there was no danger of the employer being subject to multiple punishment in a *respondeat superior* suit for assault and battery. *Id.* at 281-82. Further, the court held, an "employer can be liable for punitive damages for the act of its employee." *Id.* at 281 n.3 (citing *Gasway v. Atlanta & West Point R. Co.*, 58 Ga. 216 (1877) and *Fowler v. Smith*, 237 Ga. App. 841 (1999)).[5]

_____

[5]Defendants did not raise any issues regarding "*respondeat superior*" liability and the court does not address them here.

AO 72A
(Rev.8/82)

There is also no danger of double punishment due to the negligent retention claim brought by Plaintiff. *Respondeat superior* liability addresses different concerns than negligent retention. Negligent retention requires some proof that the defendant employer knew or had reason to know of the employee's propensity for assault and battery whereas *respondeat superior* liability does not.

**D.    Remaining Claims**

The parties have devoted varying degrees of attention to these claims and the court will here dispose quickly of those that do not require in-depth discussion.

1.    <u>Argument No. 13</u>

Defendants argue that because Defendant Pefanis allegedly harassed both male and female employees, his conduct is not actionable under Title VII. Plaintiff responded that in fact Defendant Pefanis's harassment of men and women was of a different quality. Defendant Pefanis harassed women in order to demean, degrade, and subordinate them, while he harassed men for sexual gratification.

Defendants raised this argument on motion for summary judgment before the Magistrate Judge and the Magistrate Judge found that Defendant Pefanis was not an "equal opportunity offender." Defendants objected to this portion of the Report and Recommendation and the court rejected their objections. Defendants have presented no new information to cause the court to reconsider that ruling. In fact, as Plaintiff notes, at trial Mr.

29

LaLiberty testified that Defendant Pefanis sought sex from him, while Plaintiff testified that Defendant Pefanis harassed her but never propositioned her for sex.

2.   Argument No. 12

Defendants contend that there was no evidence presented at trial to support Plaintiff's allegations of prior bad conduct by Defendant Pefanis; therefore, the court should have directed a verdict against Plaintiff and in favor of the corporations on the negligent retention claim. Defendants' factual premise is incorrect. Plaintiff pled in her complaint that Defendant Pefanis owned at least 50% of AME and GMMC, and that Pefanis used the corporations as a "platform to engage in perverse and deviant sexual behavior against employees, including sexual harassment and sexual assault." *See* Amended Cmplt., ¶ 10. Plaintiff also alleged that "Defendants were well aware of Pefanis' gross history of sexual and racial harassment in the workplace. For example, in 2004, two former Joint Employer employees, Erica Tolbert ("Tolbert") and Farrah Bowers ("Bowers"), each filed charges of sexual and racial harassment against AME based on conduct and statements by Pefanis in the workplace." *See* Amended Cmplt., ¶¶ 12-13.[6] By virtue of the fact that Tolbert and Bowers both filed charges of discrimination with the Equal Employment Opportunity Commission, *see* Amended Cmplt., ¶¶ 14-15, the corporations also were put on notice of the accusations made against Defendant Pefanis. Furthermore, Plaintiff's amended complaint,

_____

[6]The court had granted Defendants' motion *in limine* barring any discussion of racial discrimination at trial and that order was not violated during trial.

30

as read to the jury, is replete with examples of harassment she witnessed during her employment.  During trial Mr. LaLiberty testified about prior sexual assaults.

Moreover, Plaintiff alleged in her complaint that due to his status as at least 50% owner and as Chief Executive Officer and Chief Financial Officer, Defendant Pefanis and the corporate Defendants were alter egos and would therefore be aware of each other's actions.  *See* Amended Cmplt., ¶ 29 ("To state the obvious, none of Pefanis' misconduct was a surprise to the Joint Employer.  Not only was Pefanis the owner, CEO, CFO, and alter ego of the Joint Employer – but numerous senior officers of AME and Georgia Mutual witnessed, tolerated, laughed at, and encouraged Pefanis to engage in his perverted sexual comments and actions [].  Officers of AME and Georgia Mutual also ignored Forsberg's and other employees' repeated requests that Pefanis stop his misconduct.")

Thus, the court finds there was more than sufficient evidence from which a jury could conclude that the corporate Defendants were aware of Defendant Pefanis' conduct and took no action.

      3.      <u>Argument No. 2</u>

Defendants contend that as a consequence of the court's decision to strike their answer, the decision on liability was removed from the jury and despite the fact there was no factual support for her allegations, the jury was instructed to assume the allegations were true.  Further, the corporation was held liable on the mere basis of the allegation in the

complaint that it was established to give Pefanis a "platform and outlook for his sexual conduct." *See* Amended Cmplt., ¶ 58.

As the court set forth above, during the course of this litigation Plaintiff presented evidence through the factual allegations of her amended complaint and the testimony of her witnesses at trial that the corporations were, indeed, aware of the allegations against Defendant Pefanis and took no action. Both the complaint and the facts developed at trial provided evidence from which the jury could conclude that Defendant Pefanis and the corporate Defendants were alter egos. The jury, therefore, had more than sufficient evidence upon which to base a conclusion that Defendant corporations could be liable for the conduct of Defendant Pefanis. To the extent any argument remains, the court finds it simply reargues the appropriateness of the default judgment which the court has addressed above. By operation of law, when a party defaults, the well-pleaded factual allegations made in the complaint are deemed true. *See*, *e.g.*, *Eagle Hospital Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009).

4.    Argument No. 3

Defendants aver that the default entered by the court created an impossibly unlevel playing field for damages and Defendants were barred from demonstrating that Plaintiff participated in the "horseplay." Defendants also assert that "because the defendants were denied the right to contest liability, they were not permitted to contest the severity of the

injuries [Plaintiff] suffered or the pain she endured." *See* Motion, at 7. Again, the factual premise is incorrect. Throughout the pre-trial conference and the trial, it was clear that Defendants were permitted to contest the severity of Plaintiff's alleged injury and Defendants' counsel raised that issue with nearly every witness who took the stand and focused in particular on the schedule Plaintiff kept on the day she quit her job, as she testified, due to Defendant Pefanis's final act of assault against her. Because Defendants most certainly contested the severity of Plaintiff's injury, the court denies Defendants' motion for a new trial on this basis.

     5.    <u>Argument No. 11</u>

     Defendants argue that there is no factual basis for the jury's award of lost wages and benefits on negligent retention, retaliation, and assault and battery. On the jury verdict form, the jury was asked to make only one calculation of lost wages and benefits. The jury determined that this amount was $50,000. The jury was then asked upon which causes of action it found lost wages and benefits. The jury checked all causes of action. *See* Jury Verdict, at 15. Defendants contend only that there was not sufficient evidence on negligent retention, retaliation, and assault and battery. Because there is no dispute that the remaining causes of action would support lost wages and benefits, the court need not determine whether it is appropriate for these three causes of action. There is only one award of lost

wages and benefits.  So long as at least one cause of action supports it – in this case Plaintiff's claim for sexual harassment – the jury's award stands.

6.     Argument No. 6

Defendants argue that Georgia Mutual Mortgage Corporation does not have a sufficient number of employees to be held liable under Title VII.  Defendant Pefanis submitted an affidavit testifying that Georgia Mutual had less than 15 employees in each of 20 or more calendar weeks in 2006, 2007, 2008.  *See* Pefanis Aff., ¶¶ 6-7.  Title VII limits the definition of an "employer" to entities that have "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C. § 2000e(b).  The "employee-numerosity" requirement is an element of a plaintiff's claim for relief and not a jurisdictional issue.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006).

Throughout the course of the litigation, Plaintiff has contended that AME and Georgia Mutual were "joint employers" and Defendants have not challenged that assertion until the instant motion.  Plaintiff pled in her complaint that Georgia Mutual Mortgage Corporation was a "joint employer" of AME.  *See* Amended Cmplt., ¶ 7.  "For example, Georgia Mutual pays employees certain payments in connection with their employment such as bonuses and car allowances.  Pefanis simply uses Georgia Mutual to funnel funds and monies to and from himself and employees at AME."  *Id.*

34

Various tests exist to determine whether two entities may be construed as a single individual's employer for purposes of Title VII liability. *See Lyes v. City of Riviera Beach*, 166 F.3d 1332, (11th Cir. 1999) (*en banc*) (describing "integrated enterprise," "joint employers," and "agency" tests). If the entities meet any one of these tests, the total number of employees is aggregated. Here, Plaintiff alleged in her complaint that AME and Georgia Mutual Mortgage Corporation were "joint employers." That factual allegation is admitted as part of the default. There is no dispute that AME meets the employee numerosity threshold for liability under Title VII; therefore, the fact that Georgia Mutual Mortgage Corporation, itself, may employ less than fifteen people does not remove Georgia Mutual from liability because it is aggregated with AME.

AO 72A
(Rev.8/82)

7.    Argument No. 4

Defendants contend that it is inconsistent for the court to present Plaintiff's complaint to the jury asserting that AME and Georgia Mutual are "alter egos" and then allow the jury to treat AME and Georgia Mutual as separate corporations for the purpose of damages. Plaintiff asserts throughout her complaint that AME and Georgia Mutual are "joint employers," *see* Amended Cmplt., *passim*, and in certain particular paragraphs that Pefanis is the "alter ego" of the Joint Employer (AME and Georgia Mutual). *Id.* ¶¶ 10, 29, 84. Plaintiff recites that AME and Georgia Mutual "separately and jointly through their alter ego Pefanis and other employees" violated Title VII. *Id.*, ¶ 84.

As the court explained above, Plaintiff's allegations of AME and Georgia Mutual as Joint Employers relates to whether the number of employees in those corporations should be aggregated for the purpose of determining whether the entities as "Joint Employers" can be held liable under Title VII despite the fact that Georgia Mutual may not meet the "employee numerosity" requirement. Plaintiff then also refers to both AME and Georgia Mutual as "alter egos" of Defendant Pefanis. There is nothing in the "alter ego" allegation which would preclude a separate finding of liability against AME and Georgia Mutual. Rather, Plaintiff alleges that Defendant Pefanis controls, that is, acts as the "alter ego" of AME and also controls and acts as the "alter ego" of Georgia Mutual. The fact that Plaintiff alleged he controls both corporations does not mean that the two corporations cannot be

36

independent jural entities against which an award of damages can be brought. That is, the allegation of "alter ego" goes to Defendant Pefanis's relationship to the two corporations and not their relationship with each other.

        8.    <u>Argument No. 14</u>

Defendants argue that an "award against both the corporations for negligent retention of Defendant Pefanis cannot be supported if judgment is also entered against Jim Pefanis personally for the underlying conduct. In short, Defendant Pefanis may not be held liable for failing to fire himself." *See* Motion for a New Trial, at 14. As demonstrated by the jury verdict chart above, only AME and Georgia Mutual were held liable for negligent retention. Therefore, Defendant Pefanis was not held liable under a theory of negligent retention for "failing to fire himself." Defendant Pefanis is not the sole owner of AME or Georgia Mutual.

        9.    <u>Argument No. 9</u>

Defendants argue that in absence of any evidence about the income of Defendants Pefanis, AME, or Georgia Mutual, the jury had no basis upon which to award punitive damages. At trial, however, the parties stipulated as to the net worth of AME at $6.8 million. Further, the jury also knew from the reading of Plaintiff's complaint that Defendant Pefanis was at least a 50% owner of AME and that Georgia Mutual existed only as an arm

37

of AME to disburse certain bonuses to AME employees. Therefore, the factual premise of Defendants' argument is incorrect.

## III.    Conclusion

Therefore, the court GRANTS IN PART AND DENIES IN PART Defendants' joint motion for a new trial pursuant to Rule 59 or in the alternative for remittitur, and motion to enforce statutory cap [197] and DENIES Defendants' motion for an extension of time to file a reply brief [200].

To meet the statutory caps under Title VII, the court reduces the jury's award to Plaintiff of $50,000 in compensatory damages and $1,000,000 in punitive damages for her sexual harassment claim, as well as $500,000 in compensatory damages and $2,000,000 in punitive damages on her retaliation claim under Title VII. The court writes the jury's total award of $3,550,000 on the Title VII claims down to $50,000.

**IT IS SO ORDERED** this 8th day of December 2009.


        /s   J. Owen Forrester
        J. OWEN FORRESTER
        SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)