# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| Evangelina Forsberg, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:07-cv-03116-JOF |
| James Pefanis, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| AND | : | |
| | : | |
| Damon Smith, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:08cv-01042-JOF |
| James Pefanis, et al., | : | |
| | : | |
| Defendants | : | |

## OPINION & ORDER

In Civil Action No. 07-CV-3116-JOF, this matter is before the court on Plaintiff's motion to add LendXFinancial LLC as party defendant [204]. In Civil Action No. 08-CV-1042-JOF, this matter is before the court on Plaintiff's motion to add LendXFinancial LLC as a party defendant [180].

## I. Background

## A.    Procedural History

On December 17, 2007, Plaintiff, Evangelina Forsberg filed suit against Defendants, James Pefanis, AME Financial Corporation, and Georgia Mutual Mortgage Corporation, alleging federal claims under Title VII (sexual harassment and retaliation), § 1985(2), and state law claims of assault and battery, false imprisonment, invasion of privacy, and negligent retention. The parties engaged in a contentious period of discovery under the close supervision of the Magistrate Judge. The case was set down for trial before the undersigned and a pre-trial conference was held on July 14, 2009. The litigation remained contentious.

Shortly before the scheduled trial, Plaintiff filed a motion for default sanction alleging that Defendants had forged the signature of a declarant who purportedly stated that he did not witness one of the more serious incidents alleged by Plaintiff even though Plaintiff claimed he was in the room. Plaintiff had located this witness in Texas and he provided declarations to Plaintiff testifying that he had seen the incident and had not signed the document proffered by Defendants. The court held an evidentiary hearing on the matter on September 18 and 22, 2009. In an order dated October 2, 2009, the court granted Plaintiff's motion for default sanction and struck Defendants' answer. The case proceeded to trial on damages only and on October 19, 2009, the jury returned a verdict of $9,200,000 against Defendants.

2

Shortly after trial, Plaintiff began her collection efforts and discovered that while Defendants had shut down operations of AME Financial Corporation shortly after the verdict at the end of October 2009, many of the same individuals appeared to be involved in a new corporation called LendXFinancial LLC. On November 13, 2009, Plaintiff filed a motion to add LendX as a party defendant in *Forsberg* case (Civil Action No. 07-CV-3116). Counsel for Defendants Pefanis, AME Financial Corp., and Georgia Mutual Mortgage Corporation filed a response to the motion, as did LendX represented by its own counsel.

At the same time, Defendants obtained new counsel who filed a motion for a new trial. In an order dated December 8, 2009, the court granted in part and denied in part that motion. The court reduced the jury's award of damages under Plaintiff's Title VII claims to meet the statutory caps, thereby reducing the total Title VII award of $3,550,000 down to $50,000.

The court set down an evidentiary hearing for December 21, 2009, to consider Plaintiff's motion to add LendX as a party defendant. A week prior to the scheduled hearing, Plaintiff filed an additional motion for sanctions against Defendants. *See Forsberg*, Docket Entry 224. In this motion, cross-filed in *Smith v. Pefanis*, Civil Action No. 08-CV-1042-JOF, Docket Entry [175], Plaintiff contends that Defendants engaged in witness

3

tampering with respect to certain individuals who had provided information in support of Plaintiff's motion to add LendX as a party defendant.

At the hearing on December 21, 2009, counsel for Plaintiff and respondent LendX gave opening statements. LendX also called Robert Duer and Sean Murla to testify and presented documentary evidence. At the conclusion of the hearing, the court announced its intention to grant Plaintiff's motion to add LendX as a party defendant. "I'm going to grant the motion to join LendX with AME. The Court has more than ample evidence that LendX was created primarily to perpetrate a fraud upon the Court and to keep the judgment from being collected." *See* Transcript Rough Draft, at 110. At that point, counsel for Defendants Pefanis, AME Financial Corp., and Georgia Mutual Mortgage Corp. asked the court to hold off on entering the order while the parties attempted to reach a settlement. The parties agreed to a consent injunction for a period of 48 hours barring the dissipation of assets so the parties could continue settlement discussions. The parties informed the court that if no settlement was reached before noon on December 23, 2009, the injunction would end and the court would proceed to enter its order.

The parties did not settle the litigation and on December 23, 2009, the court entered an order granting Plaintiff's motion to add LendX as a party defendant. The court also entered a second amended judgment adding LendX as a liable defendant to Plaintiff's damage award. *See Forsberg*, Docket Entry 230. The court's December 23, 2009, order

4

advised that an opinion would follow that order and the court now proceeds to set forth its analysis of Plaintiff's motion.

**B.    Facts**

1.    <u>Parties' Briefs</u>

The court addresses below some facts that are more efficiently presented in a time line.  Further discussion of certain circumstances is continued below.

| Date | Event |
|------|-------|
| December 17, 2007 | *Forsberg* complaint filed |
| January 1, 2008 | Journal Entries for AME showing that three cash accounts (Investment Cash, GMMFC RE, and MM2) should be changed from $2,400,000 to zero |
| April and May 2008 | Eckland records quitclaim deeds stating that for $1 Pefanis transferred to Eckland his ownership interests in 7 pieces of real property |
| May 21, 2008 | LendXFinancial LLC registers as a corporation in the State of Delaware listing Ron Eckland as the authorized person |
| May 22, 2008 | Wayne Bonertz's wife, Irene, transfers to LendX for no consideration 13 acres of property in Fulton County (tax appraisal value $680,400) she received from Wayne Bonertz |
| June 3, 2008 | LendX registers with the Georgia Secretary of State's office, listing Robert Duer as manager |
| August 29, 2008 | LendX receives a license to operate from the State of Georgia |
| October 17, 2008 | AME and LendX file identical Change of Address forms with the North Carolina Department of Secretary of State |

AO 72A
(Rev.8/82)

| | |
|---|---|
| December 2, 2008 | Eckland files registration for LendX to do business in Florida directing the Division of Corporations State of Florida to contact Wayne Bonertz for any further information |
| December 2008 | LendX enters in to a warehouse agreement with a California bank for $4,000,000 |
| January 2009 | AME subleases 3,000 square feet of office space in Lincoln Tower Portland Oregon, the same address as LendX's Portland operations |
| January 6, 2009 | $50,000 wire transfer from AME to LendX |
| February 2009 | LendX files certificate signed by Eckland with Register of Deeds in North Carolina directing the Registrar to return a file-stamped copy of the certificate to Wayne Bonertz at AME's address |
| February 2, 2009 | LendX registers with the Arizona Corporation Commission |
| February 6, 2009 | $250,000 wire transfer from AME to LendX |
| March 13, 2009 | $350,000 wire transfer from AME to LendX |
| March 25, 2009 | $150,000 wire transfer from AME to LendX |
| April 15, 2009 | Bonertz discusses websites with Thinline IT |
| April 16, 2009 | $150,000 wire transfer from AME to LendX |
| April 17, 2009 | $100,000 wire transfer from AME to LendX |
| April 28, 2009 | First deadline for filing of Pretrial Order in *Forsberg* |
| April 30, 2009 | LendX receives FHA approval status to conduct mortgage loans using same address as Eckland's law firm |
| May 1, 2009 | Pretrial order filed in *Forsberg* |
| May 7, 2009 | AME registers LendX as a Trade Name in Forsyth County and certifies that AME is conducting business in the name of LendX and that Pefanis and Bonertz are the people conducting the business |

AO 72A
(Rev.8/82)

| | |
|---|---|
| May 26, 2009 | Notice of Jury Trial in *Forsberg* set for July 13, 2009 |
| May 28, 2009 | Amended Notice of Jury Trial in *Forsberg* set for August 10, 2009 |
| July 14, 2009 | Pretrial Conference held in *Forsberg* |
| July 22, 2009 | $416,371.60 transferred from Eckland's IOLTA account to LendX |
| July 22, 2009 | $417,000 transferred from Eckland's IOLTA account to LendX |
| August 11, 2009 | Instruction given to Thinline to separate AME and LendX websites |
| August 14, 2009 | Amended Notice of Jury Trial in *Forsberg* set for October 13, 2009 |
| August 18, 2009 | Mediation held with no settlement reached |
| August 26, 2009 | $800,000 transferred from Eckland's IOLTA account to Gateway Bank for benefit of LendX |
| September 18 and 22, 2009 | Hearing held in *Forsberg* on motion for sanctions |
| October 13, 2009 | Trial begins in *Forsberg* |
| October 19, 2009 | Jury reaches verdict in *Forsberg* |
| October 22, 2009 | CitiMortgage severs relationship with AME |
| October 26, 2009 | LendX receives approval from HUD to fund FHA loans |
| October 26, 2009 | $2,000 wire transfer from AME to LendX |
| October 28, 2009 | Bank of America terminates relationship with AME |
| October 30, 2009 | Colonial Bank ceases funding loans for AME mortgages |
| November 2, 2009 | AME notifies customers that it is no longer funding mortgages |
| December 14, 2009 | LendX changes its office address from Eckland's law firm to Perimeter Center West in Atlanta |

7

| December 14, 2009 | LendX transfers Bonertz property back to Irene Bonertz for no consideration |
|---|---|

Plaintiff served LendXFinancial, LLC with a copy of the motion on November 13, 2009, by hand delivering a copy of it to LendX's registered agent. LendX is owned by Ron Eckland, Robert Duer, Robert Anderson, and David Kanis. Robert Anderson has testified numerous times in this case and was a high ranking officer of AME. David Kanis worked for AME through its Ashford Mortgage name. Robert Duer also worked for AME. Robert Duer, Ronnie Eckland, and Robert Anderson all had authority to sign checks on behalf of AME. *See* Plaintiff's Reply, Exh. B (Colonial Bank Business Signature Card Contract for AME). The same document lists Ron Eckland as a Vice President of AME. *Id.* The list of employees of AME is nearly identical to the employees of LendX. *See* Plaintiff's Exh. H. LendX at one point operated its business out of the former law offices of Ron Eckland.

In April 2009, Wayne Bonertz started to work with an outside information technology group called Thinline IT to integrate the computer systems of AME, LendX, and Ashford Mortgage. *See* Plaintiff's First Reply, Exh. B, April 2009, e-mails. Thinline IT notified Mr. Bonertz that it was working on getting a website for (1) Ashford Mortgage, (2) Asheford Mortgage Advisors (which was to be a copy of Ashford Mortgage), and (3) LendX Financial ("New site that will look different but have the same functionality as the Ashford

8

sites.).  In response, Mr. Bonertz stated that "Lendx must be the same as AME."  *Id.*  Mr. Bonertz wanted LendX to have the "[s]ame information and functions" as AME.  *Id.*

Wayne Bonertz also informed Thinline that he had put them down as a business reference in the Commonwealth of Virginia for LendX.  *See* Plaintiff's First Reply, Exh. B (May 11, 2009 e-mail noting Virginia "will probably want to know your business relationship, do we pay our bills, that we are of good character, how long etc.  Robert Anderson is the main contact if they bring up any names or request one from you.").

In May 2009, Wayne Bonertz certified in a document filed with Forsyth County that AME Financial Corporation is conducting a business in the City of Alpharetta County of Forsyth in the State of Georgia, under the name of LendX and that the nature of the business is a residential mortgage lender and that the name and business address of the persons, firms or partnerships owning and carrying on said trade or business are: Wayne Bonertz & James Pefanis.  *See* Trade Name Documents, Plaintiff's Exh. B.

On August 11, 2009, Ashford Mortgage's sales manager, Brandon Johnson, told Thinline "[w]e are at a point with LendX that we need to start developing LendX specific info on the website.  First and foremost, we need to disable the link to AME via the secure log in link."  *Id.*  This testimony would all seem to contradict Mr. Pefanis's statement that the LendX website was not related to the AME website.  *See* Pefanis Decl., ¶ 14.

9

Brannon Ogburn submitted a declaration signed November 5, 2009, in which he states that he is a former Executive Vice President of American Sterling Bank in charge of its Wholesale Mortgage Division. *See* Ogburn Decl., ¶ 1. In late 2008, American Sterling decided to close its wholesale division and Ogburn met with James Pefanis, Robert Anderson, and Mildred Hinton to discuss the possibility of AME taking over the division. *Id.*, ¶ 2. During the meeting, Mr. Pefanis noted that he was being sued and "in an effort to reassure me that the lawsuit would not affect his, or his company's, ability to do business in the future, Mr. Pefanis informed me that he had a plan to deal with this lawsuit." *Id.*, ¶ 3. "Mr. Pefanis informed me that his plan was to open up a new company, called LendX, in which he was transferring all of the assets of AME, and that LendX would continue the business of AME." *Id.*, ¶ 4. American Sterling decided to keep its wholesale division open but some American Sterling employees went to work for AME. *Id.*, ¶ 5.

Debra Taylor, a former AME employee, also provided a declaration stating that in 2008, before she went to work for AME, she was employed by American Sterling Bank in Denver, Colorado. *See* Taylor Decl., ¶ 2. When American Sterling decided to close its Wholesale Division, Ms. Taylor met with Mr. Pefanis to discuss possible employment. *Id.*, ¶ 3. "In my first meeting with Mr. Pefanis, he informed me that he and AME had been sued in a few sexual harassment lawsuits in Georgia. He told me that the lawsuits were 'no big deal' because he had a plan to 'protect himself.'" *Id.*, ¶ 4. "Mr. Pefanis informed me that

10

his plan to protect himself was to transfer his assets to his life partner and other executives at AME. Mr. Pefanis also told me that he was going to start a new company, called LendX, and was going to transfer AME's assets to LendX." *Id.*, ¶ 5. He informed Ms. Taylor that by March 2009, "AME would be LendX." *Id.*, ¶ 6. After American Sterling closed its Wholesale Division, Ms. Taylor went to work for AME. *Id.*, ¶ 7. "In April or May 2009, I became aware that some mortgage loan applications that were submitted to AME were being given to LendX and funded in the name of LendX." *Id.*, ¶ 8. Mr. Robert Anderson AME's Vice President also told her that some mortgages were to be funded in the name of LendX. *Id.*, ¶ 9. "Thereafter, AME began funding some retail mortgages in the name of LendX. However, that stopped relatively quickly, because LendX ran into issues with its licensure and the capabilities of its warehouse line of credit." *Id.*, ¶ 10. Ms. Taylor's employment with AME terminated in June 2009. *Id.*, ¶ 11.

AME filed with the Georgia Department of Business and Finance that it also does business as Ashford Mortgage and that LendXFinancial LLC does business as Ashford Mortgage Advisors. *See* Plaintiff's Exh. F. The computer systems of the two companies were integrated. *See* Plaintiff's Reply, Exh. B (emails from Thinline IT).

Relying on the declaration testimony of Ron Eckland, it is LendX's position that in the summer and fall of 2008, LendX began to apply for warehouse lines of credit. In December 2008, LendX received a $4,000,000 line of credit with an unnamed California

bank. Because LendX wanted to be an approved lender through the Department of Housing and Urban Development to do FHA loans, LendX – according to Mr. Eckland – had to do "test cases." Some banks would not fund those "test cases." Rather, LendX needed a "sponsor" through which LendX could act as an "apprentice." AME agreed to act as LendX's sponsor and allowed LendX to use AME's line of credit with Colonial Bank to fund the test cases. *See* Eckland Decl., ¶¶ 9-15; *see also* Duer Aff., ¶¶ 5-7 (naming the California bank as Gateway Bank of San Leandro). As consideration for this "sponsorship," LendX endorsed its loans to AME and AME received all profits and fees from those loans. *See* Declaration of James Pefanis, ¶ 7. Colonial Bank required that a "trade name" be issued for the sponsor of the "test cases" so AME filed the document in Forsyth County referenced above. *Id.*, ¶ 9. In LendX's response, Mr. Bonertz provided the less than definitive testimony that "[b]ased on previous business practices, it was my understanding that our warehouse lender, Colonial Bank, required AME Financial Corporation to file a trade name filing to purchase whole closed loans from a different lender. The trade name filing was used solely for this purpose, and AME received fees for these transactions." *See* Bonertz Aff., ¶¶ 5-6.

Without citation to record evidence, LendX's brief states that LendX began closing residential real estate loans using its own lines of credit in January 2009. *See* LendX Resp., at 4.

During the summer of 2009, LendX increased its warehouse line of credit with Gateway Bank to $21,000,000, in anticipation of HUD approval. *See* Duer Aff., ¶ 8. LendX provided a $1,000,000 deposit with Gateway to secure this line of credit. *Id.* "These funds were provided by the members/owners of LendX. Neither AME Financial Corporation nor James Pefanis provided any of this funding." *Id.* Mr. Duer also states "[t]o my knowledge, no assets of LendX were received by transfer from AME Financial Corporation with the possible exception of some computer equipment which LendX purchased. No mortgages were ever transferred by AME Financial Corporation to LendX." *Id.*, ¶ 10.

Once LendX received HUD approval to fund FHA loans on October 26, 2009, LendX immediately began to hire employees. *See* Eckland Decl., ¶ 18. During its search for office space, LendX took a 30-day sublease of AME's office space. *Id.*, ¶ 20. LendX hired some AME employees. *Id.*, ¶ 19. Mr. Duer has testified that 18 of LendX's employees were never employed at AME, but he does not provide any documentation for this assertion. *See* Duer Aff., ¶ 9. For example, Mr. Duer does not explain whether these eighteen individuals were formerly employed by Ashford Mortgage, another name for AME.

2.   Decermber 21, 2009 Evidentiary Hearing

Mr. Duer, the Operations Manager for LendX, testified at the December 21, 2009, hearing. He stated that Mr. Pefanis and Mr. Bonertz told him they were going to retire and had approached the four owners of LendX to see "if we could continue on the company for

the employees that were at AME and the four of us got together and decided that we would

try and start our own company so that we could continue in the mortgage business as well

as to employ those employees of AME after we got going." *See* Rough Draft Transcript, at

23.  At that time, Colonial Bank was the lending bank for AME.  *Id.* at 27.  LendX was

seeking a warehouse line of credit from Gateway Bank in California.  *Id.* at 28.  LendX

started closing loans in February 2009 after getting licensed and getting approval to sell in

various locations.  *Id.* at 29.  Mr. Duer also explained the need for a mortgage company to

be approved by the FHA in order to have a viable business model in the current economic

environment.  *Id.* at 30.  Gateway Bank, however, would not fund FHA test cases.  *Id.* at 30-

31.  Therefore, LendX approached AME to see if AME would "sponsor" LendX's test cases.

*Id.* at 31.  After doing 19 test cases, LendX received HUD approval on October 26, 2009.

*Id.* at 31-32.

Having HUD approval, LendX wanted to increase its warehouse credit line with

Gateway Bank, but the bank required a $1,000,000 deposit to do so.  *Id.* at 33.  When LendX

was formed, Messrs. Duer, Anderson, and Kanis contributed $10 each to the corporation.

*Id.* at 33.  Mr. Duer understood that Mr. Eckland put up the majority of the $1,000,000 plus

start up costs.  *Id.* at 33-34.  With the increased warehouse line, LendX would need to have

about 50 employees.  *Id.* at 34.  To get running, LendX borrowed nearly $1,000,000 from

AME which went from AME's account at Colonial Bank to LendX's SunTrust account.  *Id.*

14

at 34-35. LendX repaid that money in wire transfers from LendX's Wachovia account to AME. *Id.* at 35.

LendX was able to secure additional funding from Gateway through an investor, Sean Murla, who joined the company in late summer 2009. *Id.* at 36-37. Mr. Murla has invested approximately $2,500,000. *Id.* at 37. LendX now has 77 employees, roughly two-thirds of whom came from AME. *Id.*

On cross-examination, Mr. Duer further testified that at the formation of LendX, Messrs. Duer, Anderson, and Kanis each became 5% owners with Mr. Eckland owning the remaining 85%. *Id.* at 42. On October 8, 2009, LendX's operating agreement was amended to show Mr. Eckland owning 69% and making a capital contribution of $6,000,000. *Id.* at 42-44. Mr. Eckland, however, did not make that capital contribution. *Id.* Mr. Duer also testified that he was aware that Mr. Eckland had transferred $800,000 in August 2009 to Gateway Bank, but he believed that Mr. Eckland received the money from Mr. Murla and then transferred it on to Gateway. *Id.* at 44-45. Although he believes there should be documents that would reflect this transfer, he does not know why they have not been produced. *Id.* at 45. Mr. Duer was not aware of two transfers of roughly $834,000 that Mr. Eckland made on July 22, 2009, from his IOLTA account to LendX. *Id.* at 46. Mr. Duer confirmed that with respect to the "loan" made between AME and LendX in early 2009,

AO 72A
(Rev.8/82)

there were no documents made to reflect the loan and no interest was paid on the loan. *Id.* at 47.

Mr. Duer testified that there would be documents reflecting LendX's application to be in the FHA test case program, but he does not know why they were not produced under Plaintiff's subpoena. *Id.* at 49. He and Mr. Eckland were responsible for collecting the documents to respond to the subpoena and Mr. Eckland was to gather the test case documents. *Id.* at 50. Mr. Eckland was the closing attorney for the FHA test cases as well as an owner of LendX. *Id.* at 51. The test cases took place in July, August and September 2009. *Id.* at 51.

Mr. Duer understood that Mr. Pefanis brought Mr. Murla in as an investor in LendX through Lee Farkas, a mutual friend of Mr. Pefanis's and Mr. Murla's. *Id.* at 52. Mr. Farkas had been associated with the mortgage company Taylor, Bean & Whitaker. *Id.*

At this point in the proceedings, Mr. Duer's testimony was halted. Plaintiff's counsel indicated his intention of impeaching Mr. Duer by means of inconsistent testimony Mr. Duer had provided in an earlier-filed affidavit. *Id*. at 54. The court instructed Mr. Duer as to his rights and cautioned him about obtaining his own counsel. The court took a recess to allow Mr. Duer to consider these issues. Upon return, Mr. Duer indicated that he would proceed without counsel and the court again cautioned him about the perils of this situation. *Id.* at 54-56, 61, 104-109. These conversations continued with the court advising Mr. Duer of the

AO 72A
(Rev.8/82)

need to consider obtaining his own counsel. Ultimately, Plaintiff's counsel advised the court that Plaintiff felt she had received enough testimony from Mr. Duer and she would forego any remaining testimony in the interest of moving the proceedings along. *Id.* at 109-110.

In the meantime, LendX presented the testimony of Mr. Murla. *Id.* at 57. Mr. Murla testified that he was currently the President of Cactus Car Wash in Ocala, Florida. *Id.* at 58. Mr. Murla was to initially invest $2,000,000 in LendX for start up expenses such as payroll and rent. *Id.* at 63. Mr. Murla also put in $800,000 to get a $300,000,000 line of credit with Gateway Bank. *Id.* Mr. Murla testified that he directly transferred the $800,000 by wire to Gateway Bank. *Id.* at 68.

Mr. Murla did no investigation of LendX or the individuals involved, but relied only on the advice of Mr. Farkas. *Id.* at 64. Mr. Murla met with both Mr. Eckland and Mr. Pefanis when considering whether to invest in LendX. *Id.* at 88-89. Mr. Murla would contribute the $2 million and become a 23% owner while Mr. Eckland would take the responsibility of signing for the $300,000,000 line of credit, according to Mr. Murla. *Id.* The October 8, 2009 amended operating agreement reflects this. *Id.* at 66. Mr. Murla stated that he had invested approximately $2,500,000 in LendX. *Id.* at 69. Mr. Duer would request money and Mr. Murla would advance it. *Id.* at 70.

Interestingly, Mr. Murla testified that when he made his initial $2,000,000 investment in August 2009, he was not aware of the pending litigation against Mr. Pefanis and AME.

17

*Id.* at 70. Realizing that LendX needed additional monies, Mr. Murla demanded that his share of the company increase to 46%. *Id.* at 71. Mr. Murla would also invest an additional $2,500,000 in real estate. *Id.* Mr. Murla's counsel prepared additional papers to reflect this in a December 2009 second amended operating agreement. *Id.* Mr. Murla would also become a manager of LendX along with Mr. Eckland. *Id.* at 72.

On cross examination by Plaintiff's counsel, however, Mr. Murla, despite extensive questioning, could not distinguish which payments he had made that were loans and which were capital contributions. *Id.* at 76-86, 96-99. He could identify twenty separate payments that he had made to LendX. *Id.* at 76. But Mr. Murla, himself, testified that he did not know which were capital contributions and which were loans. *Id.* at 82. He would make wire transfers to SunTrust, Gateway, or Mr. Eckland's trust account. *Id.* at 85. Mr. Murla testified that there would be records of his capital contributions, but could not explain why LendX had not produced those records in response to Plaintiff's subpoena. *Id.* at 86.

Plaintiff also questioned Mr. Murla about "counter withdrawals" of $1,600,000 from LendX's bank in July and August. *Id.* at 12, 86. Mr. Murla had no knowledge that hundreds of thousands of dollars had been withdrawn from LendX via counter withdrawals. *Id.* at 87.

Mr. Murla also revealed on cross examination that at the time he made the second amended operating agreement with LendX, he was aware of the fact that Plaintiff had filed a motion to add LendX as a party to the instant litigation, but felt that he needed to invest

18

additional moneys because he was "already too far into it." *Id.* at 91, 92. Despite the fact

that Mr. Eckland represented to him that he (Eckland) would invest $6,000,000, Mr. Eckland

told Mr. Murla in November or December 2009 that he did not have the money. *Id.* at 94.

Mr. Murla had no idea how Mr. Eckland was supposedly guaranteeing a $300,000,000 line

of credit at Gateway Bank when he had no money to contribute to LendX. *Id.* Mr. Murla

also testified that he believed Mr. Eckland had only made the $10 capital contribution to

LendX and had no idea that Mr. Eckland had wired nearly $1,000,000 to LendX prior to Mr.

Murla's involvement. *Id.* at 95.

Significantly, Mr. Murla testified that on behalf of LendX, he made a $50,000

payment to Garland and Samuel, counsel for AME. *Id.* at 78. Later, it appears that Mr.

Murla made two payments to Garland and Samuel, of $85,000 and $50,000. *Id.* at 81. He

also made a payment to AME's former counsel, David Ates. *Id.* at 82. Plaintiff's counsel

asked Mr. Murla who directed him to make the payments to those counsel. *Id.* at 83. Mr.

Murla attempted numerous times to avoid answering this question and was finally instructed

by the court to answer. He reluctantly testified that Mr. Eckland was the person who told

him to pay this money to AME's attorneys. *Id.* at 84-85.

## C. Contentions

Plaintiff contends that LendX can be added as a party both through Rule 25(c) and

through successor liability under Title VII and § 1985(2). Plaintiff also avers that AME and

19

LendX assumed the liabilities of one another when AME registered as the owner of LendX in May 2009 in Forsyth County and when LendX began writing loans which were the legal responsibility of AME. Further, based on the testimony of two declarants, Plaintiff avers that LendX was created solely as a means of avoiding liability in *Forsberg* and the other suits. Finally, Plaintiff argues that LendX is a "mere continuation" of AME.

LendX responds that Plaintiff is attempting to use Rule 25(c) as a debt collection mechanism. LendX further avers that Plaintiff cannot add LendX as a party now because there is no diversity of citizenship, Plaintiff's motion is untimely, and LendX has not had sufficient notice. LendX states that Plaintiff has offered no evidence that LendX was set up as a fraudulent vehicle through which to avoid liability because Plaintiff has not demonstrated what transfers may have occurred. Finally, LendX argues that it is not a "mere continuation" of AME because it established itself independently as a mortgage corporation, working to secure HUD approval. It is only mere coincidence that LendX secured HUD approval at the same time that AME dissolved due to the *Forsberg* litigation. Defendants address the same arguments as LendX.

## II.   Discussion

### A.    Preliminary Matters

As an initial matter, the court finds without merit any suggestion that Plaintiff's motion is untimely. Defendants contend that Plaintiff was aware of a company called

LendX from discovery provided to her on April 8, 2009, in the *Smith* case. Defendants do not provide the context for what information Plaintiff or her counsel may have been aware. However, it is clear to the court that AME did not cease operations until the end of October 2009. LendX did not open operations with employees in Mr. Eckland's office space until that time as well. Plaintiff had no reason until that point to suspect that Defendants might be draining the assets of AME and shifting them to LendX. Further, in light of the considerable difficulty Plaintiff has had in getting any timely or accurate financial information from Defendants, the court finds it ironic at the very least that Defendants would contend that Plaintiff in any way sat on her rights here. In short, the motion is not untimely.

LendX raises an accusation that it has not had the appropriate time to respond to Plaintiff's motion. The court disagrees. There is no dispute that the motion was served upon LendX's corporate agent on November 13, 2009. *See* Docket Entry 205. It is irrelevant for the purpose of counting time that the "papers were not forwarded to LendX until November 17, 2009." *See* LendX Resp., at 2 n.1. Under this court's Local Rules, the response is due within ten days. Prior to December 1, 2009, the ten days excludes weekends and holidays. Thus, LendX's response was due November 30, 2009, excluding weekends and Thanksgiving Day. The court did not alter or shorten the response time in any way.

LendX's response treats Plaintiff's motion as if it were raising new causes of action against LendX. This is not the case. Plaintiff has moved to add LendX as a party defendant

on the theory that LendX is a "continuation" or "successor in interest" to AME, and/or was created for the fraudulent purpose of avoiding the judgment against AME. There is no need to engage in a jurisdictional analysis or reference the laws of fraudulent transfer or piercing the corporate veil. In fact, Rule 25(c) is a procedural mechanism which does not affect the substantive aspects of the case and there is no jurisdictional analysis. *See*, *e.g. Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1263 (Fed. Cir. 1985); *Matter of Covington Grain Co.*, 638 F.2d 1362, 1364 (5th Cir. 1981) ("Rule 25(c) is not designed to create new relationships among parties to a suit but is designed to allow the [original] action to continue unabated when an interest in the lawsuit changes hands")[1]; *Ransom v. Brennan*, 437 F.2d 513 (5th Cir. 1971) ("if in personam jurisdiction has been previously acquired of the original party, then the in personam jurisdiction continued over the substituted party").

Finally, at the evidentiary hearing, LendX argued that the court would violate due process by adding LendX as a party and that Rule 25(c) could not be utilized after a judgment was reached in a civil case. LendX averred that this motion was simply a clever collections effort by Plaintiff that she could not otherwise have undertaken in federal court as she is essentially alleging a fraudulent transfer. To the contrary, numerous cases and hornbooks establish that there is no bar to using Rule 25(c) after a judgment has been

---

[1]Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/82)

entered. "Substitution may be ordered after judgment has been rendered in the district court for the purpose of subsequent proceedings to enforce judgment." *See Explosives Corp. of America v. Garlam Enterprises Corp.*, 817 F.2d 894, 907 (1st Cir. 1987) (citing 3B J. Moore & J. Kennedy, *Moore's Federal Practice*, § 25.03 at 25-27 (1987)). *See also Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 153-54 (6th Cir. 1992) (affirming substitution in the context of proceeding to enforce settlement agreement); *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 566 F.2d 8 (7th Cir. 1977) (finding fraud to avoid judgment and ordering substitution to enforce judgment); *Air Line Pilots Association International v. Texas International Airlines, Inc.*, 567 F. Supp. 78, 81 (S.D. Tex. 1983) (ordering substitution after judgment). Furthermore, as the court described above, LendX received notice of the motion as instructed under Rule 25(a) and had the opportunity to be heard and present any evidence it wished at the December 21, 2009, evidentiary hearing. *See Luxliner P.L. Export, Co. v. RDI. Luxliner, Inc.*, 13 F.3d 69, 72 (3d Cir. 1993) (when attempts are made to add party after judgment entered, party should be provided notice and opportunity to be heard and if facts are disputed between competing affidavits, district court should hold evidentiary hearing).

**B.     Rule 25(c)**

Federal Rule of Civil Procedure 25(c) *transfer of interest* provides:

> In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. Service of the motion shall be made as provided in subdivision (a) of this rule.

*Id.*

"Transferring assets of a corporation that is engaged in litigation and its effect on the lawsuit is governed by state law." *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, (11th Cir. 1994). Under Georgia state law, "[g]enerally, a corporation that purchases or otherwise acquires the assets of a second corporation does not assume the debts and liabilities of the second corporation." *See General Star Indemnity Co. v. Elan Motorsports Technologies, Inc.*, 356 F. Supp. 2d 1333, 1338 (N.D. Ga. 2004) (O'Kelley, J.) (citing *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir. 1985) (applying Georgia law)). There are, however, four exceptions to this general rule: "(1) the buyer expressly or impliedly agreed to assume such debts; or (2) the transaction amounts to a de facto merger of the buyer and seller; or (3) the buying corporation is a 'mere continuation' of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts." *See Bud Antle*, 758 F.2d at 1456; *see also Bullington v. Union Tool Corp.*, 254 Ga. 283, 284 (1985).

The "mere continuation" theory applies when "the purchasing corporation is merely a continuation or reincarnation of the selling corporation." *See General Star*, 356 F. Supp. 2d at 1338. The "key element" of "mere continuation" is a "common identity of the officers, directors, and stockholders in the selling and purchasing corporations." *Id.* (citing *Bud Antle*, 758 F.2d at 1459). *Bullington* holds:

> We acknowledge that the new corporation operated with many of the same employees, at the same location, and with a similar company name. Nevertheless, the facts in this case do not fit the holdings in previous Georgia cases because there was no [evidence of] common ownership and . . . the product alleged to be defective was not produced or sold by the new corporation. The rationale [for holding the successor corporation liable] is that the successor was in a position to improve the quality of the product in question or to reflect the possible defects in the cost of the product. Since the new corporation never produced the product, this rationale does not apply.

254 Ga. at 285. Complete identity of ownership, however, is not required. *Pet Care Professional Center, Inc. v. BellSouth Advertising & Publishing Corp.*, 219 Ga. App. 117, 118-19 (1995) (successor liability established where both businesses used the same name, operated from the same location, used the same telephone service and accounts, and three of four partners in predecessor corporation became stockholders in new corporation).

With respect to the federal claims, a separate body of law addresses whether a different corporation could be held liable under Title VII causes of action. "Ordinarily, a party not named in the EEOC charge cannot be sued in a subsequent civil action." *See Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1358-59 (11th Cir. 1994). "However, courts

25

liberally construe this requirement." *Id.* "Where the purposes of the Act are fulfilled, a party unnamed in the EEOC charge may be subjected to the jurisdiction of federal courts." *Id.* The purposes of the Act are to notify the charged party of the allegations and to allow the charged party an opportunity to participate in conciliation and to voluntarily comply with the requirements of Title VII. *Id.*

To determine whether a party not named in an EEOC charge can be held liable on a Title VII claim, courts look to a variety of factors: (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings. *Virgo*, 30 F.3d at 1358-59.

## C.     Application

While Plaintiff raises many arguments as to why LendX should be added, based on the evidence presented to the court, the court finds that LendX should be added as a party defendant under Rule 25(c) by application of the fourth exception – a transaction fraudulently entered into in order to avoid a judgment. The court notes with interest that neither Defendants nor LendX made any direct argument with respect to whether LendX

was created in a fraudulent transaction to avoid the *Forsberg* judgment. They both focused on the corporate formalities.

Although there is not the identity of ownership a party might need to satisfy "mere successor," the evidence here does come close. Messrs. Anderson, Duer, and Kanis all had high positions in AME. Mr. Eckland acted as counsel for AME and also notably had the authority to sign on AME's account. Furthermore, Mr. Eckland "leased" office space to LendX. Mr. Eckland stated in a declaration that he had the available space and had decided to wind down his law firm practice. However, the "lease" provided by Mr. Eckland raises numerous questions as to whether it was backdated. Although Mr. Eckland claims the lease was entered into on May 1, 2008, the signature page contains the date November 19, 2008 when it was printed out from a website that provides templates for leases. *See* Plaintiff's Supplemental Reply Brief, Docket Entry 226, Exh. 27. As previously noted, Mr. Eckland's track record of veracity with the court leaves much to be desired. *See* Order, *Smith v. Pefanis*, Civil Action No. 08-CV-1042-JOF, Docket Entry 174.

As outlined above, Plaintiff presented a plethora of evidence concerning monetary transfers from Mr. Eckland to LendX. The testimony of Messrs. Duer and Murla at the evidentiary hearing did little to satisfy the questions raised by those transfers. As the court addresses in further detail below, Messrs. Duer and Murla are remarkably uninformed about the finances of LendX and Mr. Eckland in particular. As he has done with his IOLTA

27

account, Mr. Eckland appears to have treated LendX's account as his own private bank, depositing money in and out without much explanation. The court also notes that Plaintiff has not even yet had the full production of documents she has sought in her subpoenas.

Defendants argue that "[w]hile Plaintiff boldly states that AME has transferred assets to [LendX], there is absolutely no evidence of any such transfers." *See* Defendants' Resp., at 8. *See also id.* at 17 ("despite repeated arguments of the Plaintiff to the contrary, there is no competent evidence that it is a transferee of any of AME's assets or that it is shielding AME's assets from the Plaintiff's judgment"). Mr. Duer also testified that "[t]o my knowledge, no assets of LendX were received by transfer from AME Financial Corporation with the possible exception of some computer equipment which LendX purchased. No mortgages were ever transferred by AME Financial Corporation to LendX." *Id.*, ¶ 10. LendX added its cries to the outrage: "The remaining possible ground [for applying Rule 25(c)], that the transaction is a fraudulent attempt to avoid liability, Plaintiff has offered absolutely no proof; only innuendo and hearsay. What transfers allegedly occurred?" *See* LendX Resp., at 7. "No assets of AME have been traced to LendX." *Id.* at 8.

Despite these vigorous protestations, based upon the document collection efforts of Plaintiff, there is now an answer to "what transfers allegedly occurred" and assets have been traced. The checking account statements of AME clearly show transfers of money from AME to LendX in the following amounts: (1) $50,000 on January 6, 2009; (2) $250,000 on

28

February 6, 2009; (3) $350,000 on March 13, 2009; (4) $150,000 on March 25, 2009; (5) $150,000 on April 16, 2009; (6) $100,000 on April 17, 2009; and (7) $2,000 on October 26, 2009. *See* Plaintiff's Reply, Exh. A.[2]

Defendants and LendX contend that it is merely coincidental that LendX received HUD approval on October 26, 2009, at the same time that the $9.2 million verdict was rendered against AME and AME's financing dried up as a result. (LendX offers a different explanation for the reason Colonial Bank stopped funding AME mortgages. "The AME line of credit had been with Colonial Bank. Colonial Bank failed and its assets were taken over by the FDIC. Shortly thereafter, the line of credit was terminated." *See* LendX Resp., at 5.)

However, there is no definitive description in the record of the FHA approval process or what constitutes the procedure for "test cases." Mr. Bonertz's affidavit indicates his "understanding" about what was needed for the "test cases" and why he had to register LendX as a trade name for AME. But there is no testimony from him that this was an actual requirement of the FHA. Further, Defendants' and LendX's chronological explanation for

---

[2]The court sets aside for the moment Defendants' incongruous statement that although they agreed during the *Forsberg* trial that AME's value was approximately $6,800,000, they now contend that figure was the value at the year end of 2008 and much of the company's worth had dissipated due to negative publicity from the employment lawsuits. The court takes judicial notice of *Wells Fargo Funding, Inc. v. AME Financial Corp.*, Civil Action No. 09-CV-1586-BBM (filed June 12, 2009) and *JPMorgan Chase Bank, N.A. v. American Mortgage Exchange Financial Corporation*, Civil Action No. 08-CV-2543-LTW (filed August 8, 2008). Both suits raise breach of contract claims for Defendant's failure to repurchase "defective" mortgage loans.

AO 72A
(Rev.8/82)

events as they occurred relies to a significant extent on the fact that LendX coincidentally received FHA approval on October 26, 2009, at the same time AME was "forced" to close its doors because of the jury verdict in *Forsberg*. HUD records show, however, that LendX Financial LLC was approved for business in Atlanta, Birmingham, Columbia, and Portland, as early as April 30, 2009. *See* Plaintiff's Reply, Exh. A. There is no explanation of whether this April 2009 approval is something different than the October 26, 2009, approval.

Next, Plaintiff presented the declarations of two individuals, Brannon Ogburn and Debra Taylor, who both testified that Mr. Pefanis assured them he had a plan in mind to deal with the multitude of employment discrimination actions filed against him and his corporation, AME Financial. LendX makes no argument with respect to these two declarations. Defendants do not dispute the contents of the declarations, rather Mr. Pefanis states that "I never told Mr. Ogburn that I was transferring all of AME's assets to [LendX]." *See* Pefanis Decl., ¶ 19. Interestingly, Mr. Pefanis's explanation leaves open much opportunity for interpretation. For example, "some" might not be "all." Defendants do complain that Mr. Ogburn has an axe to grind against Mr. Pefanis because Mr. Ogburn was not hired by AME, but they offer no similar explanation for Ms. Taylor's testimony nor do they dispute any of her testimony. Defendants contend that Mr. Ogburn's declaration contains hearsay and is simply the sour grapes of a disgruntled job applicant. Mr. Ogburn's

30

declaration, however, is not hearsay with respect to Defendants because it contains statements of a party opponent.

Evidence adduced at the December 21, 2009, hearing also sheds much light on the relationship of LendX and AME. Most significantly, over his obvious reluctance, Mr. Murla was forced to admit that although he is an investor in LendX only, Mr. Eckland directed him to provide $135,000 to Garland, Samuel & Loeb, AME's counsel. He was also instructed to wire funds to AME's former counsel, David Ates.

Mr. Murla met with both Mr. Eckland and Mr. Pefanis when he was being wooed as an investor to LendX. If LendX was an entity to be completely separate from AME there would have been no need for Mr. Pefanis to meet with Mr. Murla.

Further, it is clear from the testimony that Mr. Duer has no idea of the financial transactions between Mr. Eckland, AME, and LendX. Mr. Duer believed that the $800,000 Mr. Eckland moved from his IOLTA account was given to him by Mr. Murla and eventually went to Gateway Bank. This proved to be incorrect, however, because Mr. Murla testified that he wired the $800,000 directly to Gateway Bank. Mr. Duer also testified in his previous affidavit that there was never any exchange of monies between AME and LendX. This is demonstrably false as shown in the timeline above. While Plaintiff was kind enough to spare Mr. Duer the potential liability of reviewing these inconsistencies on the stand, Mr.

31

Pefanis and Mr. Eckland were more than willing to have Mr. Duer attempt to explain these issues to the court.

The court is not certain as to whether Mr. Eckland and Mr. Pefanis have simply kept Mr. Duer in the dark about certain matters and he is an unwitting dupe or whether Mr. Duer knows more than he has let on. The same analysis applies to Mr. Murla. It is clear that Mr. Murla relied extensively on the advice of Lee Farkas, a friend of Mr. Pefanis's, in making his investment in LendX. It is also clear that he was kept in the dark about significant matters, such as the fact that his $135,000 plus payment for attorney's fees inured directly to the benefit of AME and not LendX. He also was not informed of the pending litigation when he made his initial investment or of the fact that Mr. Eckland never had $6,000,000 to invest. Mr. Murla is also under the mistaken impression that LendX has a $300,000,000 line of credit with Gateway Bank and that Mr. Eckland is guaranteeing that line. In the end, it is not necessary for the court to decide the role of Mr. Duer and Mr. Murla in this drama. It became more than clear upon the testimony of Mr. Duer and Mr. Murla that neither could explain the financial shenanigans Mr. Eckland has engaged in by moving funds among his IOLTA account, his firm's operating account, AME, and LendX.

It is also clear from the facts outlined in Plaintiff's briefings that Mr. Bonertz had a significant and vital role in the establishment of LendX, including funneling real estate assets to LendX through his wife (although they were later funneled right back along the

32

same path), and filing all of the necessary corporate papers for LendX to operate, including a document with Forsyth County that describes AME as doing business as LendX, an admission to a government agency that the corporations are the same. As the court stated at the December 21, 2009, hearing, there is ample evidence that LendX was created as a fraud to avoid the judgment entered in the *Forsberg* case and the court orders that LendX be added as a defendant in *Forsberg* and *Smith* under Rule 25(c).

Further, in considering the factors as to whether a party not named in an EEOC charge can be held liable on a Title VII claim, the court notes that the same evidence as discussed above demonstrates that AME and LendX have a similarity of interest even though Plaintiff could not have ascertained the identity of LendX at the time she filed her EEOC charge as LendX was not established until after Plaintiff filed suit. LendX certainly had notice of Plaintiff's allegations as three of the four founding members of LendX were high ranking officers in AME and had testified in the *Forsberg* case, and the fourth, Mr. Eckland, has been significantly involved in the discovery and litigation of this matter. While LendX did not have an opportunity to participate in the reconciliation process, this was because it was a corporation later established in a fraudulent attempt to avoid the *Forsberg* judgment. For this reason, the court also finds that LendX was not prejudiced by its exclusion from the EEOC process. For all of these reasons, the court finds that LendX can also be held liable on Plaintiff's Title VII and related claims.

## III. Conclusion

In Civil Action No. 07-CV-3116-JOF, the court GRANTS Plaintiff's motion to add LendXFinancial LLC as party defendant [204]. In Civil Action No. 08-CV-1042-JOF, the court GRANTS Plaintiff's motion to add LendXFinancial LLC as a party defendant [180].

**IT IS SO ORDERED** this 26th day of January 2010.


                    /s   J. Owen Forrester
                    J. OWEN FORRESTER
          SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)